(153 App. Div. 93.)

PEOPLE v. CUMMINS.

(Supreme Court, Appellate Division, First Department. November 15, 1912.)

1. LARCENY (§ 44*)—EVIDENCE—ADMISSIBILITY.
     Where, on a trial for the larceny of checks and their proceeds, the theory of the prosecution was that the ownership remained in a bank, that the moneys were advanced to a trust company as trustee to take up loans secured by stock, and to hold the stock thereby released until sold by accused, who appropriated the checks and proceeds to his own use

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and asserted a right so to do, the prosecution, showing that accused did not account for any of the collateral released, could trace the use of the collateral as bearing on the motive and intent of accused.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. § 134; Dec Dig. § 44.*]

**2. LARCENY (§ 26*)—ESTOPPEL.**

The state is not estopped from prosecuting one for larceny of checks or their proceeds merely because third persons, joining with him in the transactions resulting in the issuance and delivery of the checks, were estopped from claiming that the checks were delivered in trust for a specified purpose.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. § 54; Dec. Dig. § 26.*]

**3. LARCENY (§ 57*)—EVIDENCE—SUFFICIENCY.**

Where, on a trial for larceny of checks or their proceeds, the theory of the prosecution was that the ownership of the checks and of the proceeds remained in a bank, and that the moneys were advanced to a trust company as trustee for a specified purpose, and the undisputed evidence showed that the transaction was not open, that the checks showed on their face that they were intended for the trust company, that no entry was made on the records of the company, either of the trusts or of its interest in the checks, accused, appropriating to his own use the checks and the proceeds, was not entitled to an acquittal, under Penal Law (Consol. Laws 1909, c. 40) § 1306, on the ground that what was done was done openly and in good faith, and in the belief that he had title to the proceeds.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 150, 151; Dec. Dig. § 57.*]

**4. LARCENY (§ 26*)—EVIDENCE—EFFECT.**

Where one, wrongfully appropriated to his own use, checks and their proceeds, the one having the beneficial ownership of the checks and proceeds was not required to examine the return vouchers, to determine that the proceeds passed to accused's individual account, and the failure to do so did not relieve accused from criminal responsibility.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. § 54; Dec. Dig. § 26.*]

**5. LARCENY (§ 14*)—LARCENY BY TRICK—ACTS CONSTITUTING.**

Where accused induced a bank to consent that a trust company should act as trustee, and he had previously formed an intention of misappropriating funds intended for delivery by the bank to the trust company, accused, misappropriating the funds, was guilty of larceny by trick and device.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 34-38; Dec. Dig. § 14.*]

**6. LARCENY (§ 3*)—MISAPPROPRIATION BY BAILEE.**

Under an indictment charging accused with the larceny as bailee of checks and their proceeds, a conviction for a misappropriation by accused of the proceeds was authorized, though the intent to misappropriate the proceeds was not formed until after accused, as bailee, obtained possession of the checks.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 3-10; Dec. Dig. § 3.*]

**7. CRIMINAL LAW (§ 1040*)—APPEAL—QUESTIONS REVIEWABLE.**

Where an indictment charged in separate counts, larceny in the common-law form and larceny as bailee, accused could not, for the first time on appeal, complain of a general verdict of conviction, in the absence of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

any request for instructions directing the jury to specify the counts on which they found accused guilty.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2649; Dec. Dig. § 1040.*]

8. LARCENY (§ 82*)—EVIDENCE—SUFFICIENCY.

Where an indictment for larceny charged in some counts that the property stolen belonged to a bank, and in other counts that it belonged to a trust company, the jury could convict accused for stealing the property, without determining whether it belonged to the bank or the trust company, but determining that it did not belong to accused.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 205–207; Dec. Dig. § 82.*]

9. INDICTMENT AND INFORMATION (§ 128*)—LARCENY (§ 82*)—CHARGING CRIME IN DIFFERENT FORMS—EVIDENCE—QUESTION FOR JURY.

An indictment for larceny may charge larceny in common-law form and larceny as bailee, and the jury, on the evidence, must determine whether, if accused stole the property, he stole it by trick or device, or while acting as bailee.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 403–413; Dec. Dig. § 128;* Larceny, Cent. Dig. §§ 205–207; Dec. Dig. § 82.*]

10. GRAND JURY (§ 37*)—COMPELLING ACCUSED TO TESTIFY—EFFECT.

A motion to dismiss an indictment, on the ground that accused had been compelled to testify before the grand jury, is properly denied, where nothing was disclosed by accused's examination that was not already known to the district attorney, and no use was made of accused's testimony in preparing the case for trial.

[Ed. Note.—For other cases, see Grand Jury, Cent. Dig. § 78; Dec. Dig. § 37.*]

11. GRAND JURY (§ 37*)—COMPELLING ACCUSED TO TESTIFY—EFFECT.

Accused's sole remedy in such case is to refuse to answer, and sue out a writ of habeas corpus to have his rights determined, or to object to the use of testimony on the trial against him.

[Ed. Note.—For other cases, see Grand Jury, Cent. Dig. § 78; Dec. Dig. § 37.*]

12. WITNESSES (§ 293½*)—PRIVILEGE AGAINST INCRIMINATION—CONSTITUTIONAL RIGHTS.

Const. art. 1, § 6, declaring that no person shall be compelled in any criminal case to be a witness against himself, protects one against being compelled to testify against himself, and against being compelled in any judicial proceeding, civil or criminal, directed against him or another, either as a party or a witness, to disclose any information by which evidence may be obtained for use against him as to any criminal offense, unless he has been given complete immunity against prosecution therefor.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1009–1014; Dec. Dig. § 293½.*]

13. CRIMINAL LAW (§ 695*)—EVIDENCE—OBJECTIONS—SUFFICIENCY.

An objection to evidence, that it is immaterial and irrelevant, does not raise the objection that the evidence violates the privilege granted by Const. art. 1, § 6, declaring that no person shall be compelled to be a witness against himself.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1633–1638; Dec. Dig. § 695.*]

14. WITNESSES (§ 304*)—PRIVILEGE AGAINST INCRIMINATION.

Const. art. 1, § 6, declaring that no person shall be compelled in any criminal case to be a witness against himself, does not prevent the prose-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cution in a criminal case from proving facts with respect to which ac-
cused was compelled to give testimony, where such facts were in posses-
sion of the prosecution before the examination, and the facts testified to
may be proved by other testimony than the testimony of accused.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1051, 1052;
Dec. Dig. § 304.*]

Appeal from Criminal Term, New York County.

William J. Cummins was convicted of grand larceny in the first
degree, and he appeals.    Affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT,
MILLER, and DOWLING, JJ.

Herbert C. Smyth, of New York City (Max D. Steuer, Henry W.
Unger, and William D. Guthrie, all of New York City, on the brief),
for appellant.

John Kirkland Clark, of New York City (Robert C. Taylor, of
New York City, on the brief), for the People.

LAUGHLIN, J.   The indictment was duly filed on the 20th day
of April, 1911, and it contains six counts.   The court withdrew the
third and sixth counts from the consideration of the jury, and the
other four were left to the jury, and a general verdict of guilty was
rendered.

Each of the four counts of the indictment which were left to the
jury predicates the larceny on the appropriation by the defendant to
his own use of four checks, or the proceeds thereof, of the Nine-
teenth Ward Bank, made on the 23d day of April, 1910, payable to
the order of the Carnegie Trust Company.   One of the checks was
on the National Reserve Bank for $5,000, one on the Chase National
Bank for $10,000, one on the Mercantile National Bank for $25,000,
and one on the Empire Trust Company for $100,000.   It does not
definitely appear to whom the checks were delivered, but they were
presented to the vice president of the Carnegie Trust Company, and
were indorsed:

"For credit account of W. J. Cummins.
                      "Carnegie Trust Company,
                          "R. L. Smith, Vice President"

—the indorsement, other than his signature, having been written by
other employés of the Carnegie Trust Company, and they were there-
upon indorsed by the defendant, as follows:

                  "For deposit.
                      W. J. Cummins"

—and deposited to the credit of the defendant's individual account
in the Carnegie Trust Company, in which his balance, at the com-
mencement of business on that day, was $765.19.   The checks were
all collected in due course.   The first and fourth counts charged
larceny in the common-law form, and the second and fifth charged
the defendant with having committed the larceny as agent, bailee,
or trustee.   See Penal Law [Consol. Laws 1909, c. 40] § 1290.   The

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

only difference between the first and fourth and the second and fifth. counts is that in the first and second it is charged that the property was owned by the Carnegie Trust Company, while in the fourth and fifth it is charged that it was owned by the Nineteenth Ward Bank.

The theory of the prosecution is that the beneficial ownership of the checks, and of the proceeds thereof, remained in the Nineteenth Ward Bank, and that the moneys were advanced to the Carnegie Trust Company, as agent, bailee, or trustee, to take up certain loans that had been made to Warner Van Norden and Warner M. Van Norden, on the security of shares of the capital stock of the Twelfth and Nineteenth Ward Banks, and to hold the collateral thus released until it could be sold by the defendant, or pledged elsewhere, and the proceeds used to take up two notes, for $70,000 each, one made by Charles A. Moore, Jr., and the other by the Merchants' & Manufacturers' Securities Company, made for it by said Moore as an officer, each bearing the same date as the checks, upon the discount. of which, in form, the checks were issued. The Van Nordens owned a controlling interest in the capital stock of the Van Norden Trust Company, which controlling interest had been purchased by the defendant and his associates, and also a controlling interest in the capital stock of the Twelfth and Nineteenth Ward Banks, most of which had been pledged with banks and trust companies as security for their individual notes; and for the purchase of this stock, the defendant held an option, in form running to him, but in behalf of himself and his associates. These banks were known as Van Norden banks. The younger Van Norden had attained considerable notoriety of a character which, it was deemed by the officers and directors of the Trust Company and Nineteenth Ward Bank, might seriously prejudicially affect the Trust Company and these banks. The defendant was a director of the Carnegie Trust Company, and the chairman of the executive committee thereof, and he was likewise a director in the Van Norden Trust Company and the Van Norden banks. The evidence shows that, through a friendly board of directors, he virtually controlled the Carnegie Trust Company, and he had virtually come into control of the Van Norden Trust Company; but one Bradley Martin, Jr., was, prior to the 19th day of April, 1910, its vice president and active head, and he was also president of the Nineteenth Ward Bank, and, there being no vice president, in charge of its affairs, and, as the evidence shows, he was in effect the bank. The defendant and other directors of the Carnegie Trust Company had procured individual loans from it, and had obtained loans from it for various industrial and mining corporations, in which they were interested; and complaint of this had been made by the superintendent of banks. Early in the year 1910, the superintendent of banks had particularly complained of the outstanding loans of the Carnegie Trust Company to directors, and on the morning of the 13th day of April, 1910, he instituted an investigation of the affairs of the Carnegie Trust Company, as of the close of business the day before. The Carnegie Trust Company at that time still held two individual notes of the defendant, and the notes of other directors. Within a day or two prior to the 19th day of April, 1910, the defendant rep-

resented to Martin that some of the Van Norden notes would be called, and that it was likely that the stock would be thrown upon the public market, which would affect the Van Norden Trust Company and the two banks.

According to the evidence in behalf of the people, the defendant suggested to Martin that he join the syndicate in purchasing the Van Norden stock, and that straight unsecured loans be made by the uptown banks, by which was meant the Van Norden Trust Company and the Nineteenth Ward Bank, to the directors to enable them to purchase said stock, and thus prevent the injury to the Van Norden banking institutions which might otherwise result; but Martin declined to join the syndicate and refused to consent to having the loans made, and at the same time offered to invest individually $100,000 in purchasing the stock on the basis of the defendant's option, with which apparently he was familiar. The regular meeting of the board of directors of the Van Norden Trust Company was held on the 19th of April, and according to the evidence in behalf of the people, consisting principally of the testimony of Martin, corroborated, in the main by Directors Crockett and Condon, and Robinson, the secretary, and by McIlvaine, the attorney for the Van Norden Trust Company, the defendant then renewed the statement that the Van Norden loans were being recalled, and there was a discussion with respect to making such loans for said purpose, and Martin refused to favor them, stating that he believed that the Trust Company and Ninteenth Ward Bank would be justified in making the loans to buy the stock for their own protection under the circumstances, and agreed to favor loans by the Van Norden Trust Company and Nineteenth Ward Bank to certain directors, the proceeds to be held by a trustee for the purpose of taking up any loans to the Van Nordens, secured by the capital stock of the Twelfth or Nineteenth Ward Banks, payment of which might be pressed, and holding the collateral thus released for the benefit of the Van Norden Trust Company and Nineteenth Ward Bank, respectively, as already stated; and this plan was then and there agreed upon.

On the other hand, the defendant testified, and he was corroborated in the main by the testimony of Reichmann, who was the president of the Carnegie Trust Company, but who had just been convicted of making a false report to the banking department, and to some extent by others, that it was understood that the money was to be loaned outright and unconditionally, but that the purpose of procuring the loan was stated to be to relieve what he termed the "general situation," by which he apparently meant a condition of financial embarrassment affecting him and his associates individually, and the Carnegie Trust Company and various corporations in which he and his associates were interested, and for which they had procured loans from these banking institutions, and thus avert danger to their plan to merge the two trust companies and the two banks. At that meeting of the board of directors of the Van Norden Trust Company, Crockett, who was the defendant's brother-in-law, was elected president. The only formal action taken with respect to the loans was the adoption of a resolution granting the application for demand loans at

6 per cent. by Director Condon for $75,000, and Directors Reich-
mann, Moore, and Crabbs for $60,000 each, "subject to the approval
of the officers." A meeting of the board of directors of the Nine-
teenth Ward Bank was held the next day, and as the directors, with
two exceptions, were the same as those of the Van Norden Trust
Company, the purpose of the meeting was understood, but it was re-
stated. A similar resolution was adopted, in form granting the ap-
plication of Director Condon and the defendant for loans, for $70,000
each, on demand at 6 per cent., "subject to the approval of the
officers."

The evidence on the part of the people tends to show that the
phrase "subject to the approval of the officers" was inserted for the
reason that a trustee had not been agreed upon, and that after this
meeting of the directors of the Nineteenth Ward Bank, and on that
day or the next, the defendant suggested the Carnegie Trust Com-
pany as trustee, and Martin at once acquiesced in that suggestion.
The evidence does not show that there was any agreement that the
understanding with respect to the trust should be reduced to writing;
but evidence on the part of the people indicates that this was doubt-
less understood, for it shows that the defendant, on the 21st day of
April, 1910, presented to the vice president of the Carnegie Trust
Company, for signature, a letter as follows:

"Carnegie Trust Company.

"New York, April 20, 1910.

"Mr. Watkins Crockett, President Van Norden Trust Company, Fifth Ave-
nue, New York City—Dear Sir: We acknowledge receipt hereof from the
Van Norden Trust Company of $195,000, the proceeds of the following notes:

"Demand note of Martin J. Condon, $75,000.

"Joseph B. Reichmann, $60,000.

"Charles A. Moore, Jr., $60,000.

"The above amount to be used by us toward the payment of Carnegie
Trust Company stock at $1.75; Nineteenth Ward Bank stock at $2.50;
Twelfth Ward Bank stock at $1.

"We agree to hold in trust for you, or any trustees named by you, the
above collaterals as paid for by us at prices mentioned above. Whatever
part of the above amount is not employed in the purchase of the above
stocks shall be subject to your order at any time.

"Yours very truly,                R. L. Smith, Vice President."

"Dict. R. L. S."

And thereupon he and Moore took this letter, together with demand
notes by Reichmann and Moore, for $60,000 each, to Crockett, where-
upon Crockett raised the objection that the notes and letter were not
in accordance with the understanding at the directors' meeting, and
was informed by the defendant that they were as he and Martin had
agreed upon, and Crockett, after communicating with Martin by tele-
phone, caused two checks to be issued for the amount of the notes,
one on the Van Norden Trust Company, and the other on the Chase
National Bank, each for $60,000. The vice president of the Carnegie
Trust Company indorsed these checks over to the order of Moore, and
they were deposited to the credit of Moore's individual account with
the Carnegie Trust Company; and according to the testimony of the
vice president this was done pursuant to a direction given by Reich-

mann, the president of the Carnegie Trust Company, who, in the presence of the defendant and of Moore, stated that they were given for the proceeds of individual notes discounted at uptown banks, and should have been made payable to the order of the individual. On that day the defendant received a check from Martin for $100,000, with which to purchase Twelfth and Nineteenth Ward Bank stock to that extent and deliver it to Martin, and he deposited the check to his individual credit in the Carnegie Trust Company. At the time of this deposit to the credit of Moore's account, his balance was only about $1,000, and on that day he drew a check against it for $100,000 in favor of the Mercantile National Bank, in payment for the stock which the defendant purchased for Martin, and on the 4th day of May, 1910, Moore drew a check to the order of the defendant, which was credited to his said account, for the balance of the $120,000 received from the Van Norden Trust Company. On the 22d day of April 1910, the third note specified in the letter from the Carnegie Trust Company to the Van Norden Trust Company, relating to the trust, was presented to the Van Norden Trust Company, and a check for the amount thereof to the order of the Carnegie Trust Company was issued, which the vice president of the Carnegie Trust Company, by like direction, indorsed in the same manner as he indorsed the others, and it was credited to the defendant in the same account as the others.

On the 23d day of April, 1910, a letter addressed to the Nineteenth Ward Bank was signed by the vice president of the Carnegie Trust Company. This was identical with the letter to the Van Norden Trust Company, with the exception of the names of the makers and the amounts of the notes. The evidence on the part of the people tends to show that this was presented to Martin, as president of the Nineteenth Ward Bank, together with the two notes, one by Moore and the other by the Merchants' & Manufacturers' Securities Company, to which reference has already been made, and thereupon he caused the checks, with the larceny of which the defendant is charged, to be issued. The vice president of the Carnegie Trust Company testified that, to his best recollection, the defendant also spoke to him about this letter; but he could not give the conversation. The defendant denied any knowledge or information with respect to either of these letters, and his counsel, in summing up his case, in effect charged that they had no existence at the time, and were fabricated by the prosecution. There is other evidence tending to show that this letter was openly kept by the Nineteenth Ward Bank with these notes, and that its existence was known to others than Martin, connected with the bank. The defendant himself testified that on the 21st day of April the Mercantile National Bank demanded that Van Norden's loan secured by Twelfth and Nineteenth Ward Bank stock be taken up *that day,* and that he directed that a letter be written, and sent with "the note" that Moore and Reichmann had signed, "to the uptown banks and get the checks down there as quickly as they could, and send up to the Mercantile National Bank and pay them" $100,000. That testimony evidently relates to the Moore and Reichmann notes,

.and the payment of the $100,000 was made by Moore's check as already stated. The fact that the trust letter to the Nineteenth Ward Bank provided that the money was to be used in purchasing the stock ·of that bank is an indication that that letter was copied from the first; for the evidence on the part of the people tends to show that it was ·understood that the bank could not be a party to the purchase of its ·own stock, and that the funds advanced by the Nineteenth Ward Bank were to be used to purchase the stock of the Twelfth Ward Bank, .and to accomplish that purpose were in one instance to be first used to release certain stock of the Carnegie Trust Company.

The jury were fairly warranted in finding that the defendant dictated these letters, or directed their dictation, and had full knowledge with respect thereto. The fact that they do not conform in all re-.spects to the resolutions is immaterial. Neither Reichmann nor Moore was a director of the Nineteenth Ward Bank. The only object of having the board of directors adopt the resolutions was to conform to ·the requirements of law with respect to loans to directors. In addition to the moneys deposited to the credit of the defendant, as already stated, there were deposited to his credit two further items, aggregating the sum of $2,468.48, prior to May 12, 1910, on which day his balance had been reduced to $26.06. The $100,000 deposited to his ·credit on April 21, 1910, really represented the money received from ·the Van Norden Trust Company; for he allowed $100,000 of that to be appropriated to buy stock for Martin, and he appropriated Martin's check. On the very day his account was increased by the $100,-·000 deposited, one of his individual notes, held by the Carnegie Trust Company, amounting, with interest, to $49,915.84, and an individual note of Reichmann, so amounting to $30,358.53, which had been dis-·counted by the Carnegie Trust Company, and ·which were carried on its books as unsecured, but in fact 190 shares of the Carnegie Trust ·Company stock was held as security for the latter note, and released by its payment, were charged up to the defendant's account on the books of the Carnegie Trust Company. On April 23, 1910, after the defendant's account was credited with the $140,000 in question, it was debited with $71,175.03, consisting of three checks in payment of .another note held by the Carnegie Trust Company against him, and a note held by it against Moore, carried as unsecured, but in fact se-·cured by 100 shares of the Carnegie Trust Company stock, which was released by its payment, and a note made by one of the companies in which the defendant was interested and held by the Carnegie Trust ·Company; and on the same day, his account was charged with an-·other check for $49,527.50, in payment of an individual note of Condon, carried by the Carnegie Trust Company as unsecured, but se-·cured by 300 shares of its capital stock. On April 28, 1910, the defendant's account was debited with $39,013.66, consisting of two checks in payment of his note and a note of Reichmann, held by the Nineteenth Ward Bank, the payment of which released 100 shares of the Twelfth Ward Bank stock and 250 shares of the Carnegie Trust Company stock. It was also claimed by the defendant, on controverted evi-·dence, that the payment of his two notes, and the note made by one

of his companies, released other Carnegie Trust Company stock. On April 22, 1910, the defendant's account was debited with a check for $9,151.66, given to the National Reserve Bank in settlement of a note made for the Van Nordens by Lazalle, Matthews & Co., releasing collateral consisting of 19 shares of Nineteenth Ward Bank stock, and 40 shares of the Twelfth Ward Bank stock, and certain bonds, and on May 2, 1910, with a check for $35,000, in payment of a note made by one of the Van Nordens and held by the Fourth National Bank, thereby releasing 224 shares of Nineteenth Ward Bank stock. Martin was not connected with the Carnegie Trust Company, and had but general knowledge of its affairs. .

The people contend that the emergency with which the defendant was confronted, owing to the investigation of the Carnegie Trust Company by the banking department, and to his financial embarrassment in other directions, furnished the motive, and that when he found that he could not obtain straight loans, and that Martin insisted upon there being a trustee, he conceived the idea of having his own company, which he dominated, appointed trustee, with the purpose of thus enabling him to obtain the money and to retire these notes, as he did before the investigation by the banking department was finished, and to meet other obligations. He impressed Martin with the importance of immediate action to take up the Van Norden loans, stating to him and to the directors of the Van Norden Trust Company that they were being called for payment. On the day he received this money from the Nineteenth Ward Bank, he was subpœnaed to testify before the superintendent of banks two days later, and on the examination was asked about the Carnegie Company directors" notes, and stated that those to which reference has been made had been paid. .

[1] None of the collateral released by the use of these funds was held by the defendant for the account or use of the Van Norden Trust Company, or the Nineteenth Ward Bank; nor did he account for any part of it to the Carnegie Trust Company. He used it as if it were his own in securing and redeeming his individual obligations, and those of his associates, and of the corporations in which he and they were interested. During the presentation of the people's case, it appeared by a statement of counsel for the defendant that he would contend that the defendant did not use these funds for his individual benefit, but that he received them for the purpose of protecting certain loans, and that one Lyman, "as trustee," was to hold the collateral "in lieu of this money," and offered to give the district attorney a list of the stock claimed to have been acquired under this arrangement, and a statement with respect to the disposition of the stock, and it appears that he subsequently did this. The fact that some of the fund was used for the purpose of taking up Van Norden loans lent plausibility to this contention, and the people subsequently traced the use of the collateral released by the use of these funds, as far as they were traceable. Some of the evidence was received over the defendant's objection and exception. We think that it was entirely competent as bearing on the intent of the defendant, which was an important element of

the crime, and on his motive as well. Although the trust letters were not strictly accurate, according to the testimony, it is impossible to satisfactorily explain them on any other theory than that this money was advanced by the Nineteenth Ward Bank for a particular or special purpose, and that it retained the beneficial ownership, merely parting with possession in trust, or on an agency to use the funds for a specified purpose.

[2] The defendant points to uncontroverted evidence showing that no entry or record was made by the Nineteenth Ward Bank with respect to the alleged trust agreement, and to the fact that upon the books of the bank the loan was entered and carried in all respects as if it were an unconditional loan of money on the purchase or discount of a note, and when complaint was later made by the superintendent of banks to the effect that the discount of these notes had reduced the Nineteenth Ward Bank reserve below the amount required by law, its president answered that the makers of the notes had been called upon to make payments thereof, and the Nineteenth Ward Bank did call upon the makers, and not upon the Carnegie Trust Company, to make payments, and a payment of $8,000 was made by the maker of each note, and, furthermore, that the interest was regularly paid by the makers. The people say in answer to this contention, that it was expected at the time that the transaction would be temporary, and that Martin was assured by the defendant that one Hill, who was then in Europe, would soon return and buy the securities, which is borne out by Martin's testimony; that the defendant and his associates controlled the corporate maker of one of the notes, and that the maker of the other was an associate of his; and that, therefore, everything that was done is explainable on the theory that it was intended to have it appear in form by the records that these were straight loans, while as a matter of fact such was not the real transaction; and as further evidence that the real transaction was not, as entered, the discount of the notes, the people draw attention to the fact that the checks were not drawn to the makers, but to the Carnegie Trust Company, which is in harmony with the trust letters.

The defendant relies on an assignment of the two notes, which was "without recourse" by the Nineteenth Ward Bank to Mr. Phips, Martin's father-in-law, January 7, 1911, as showing that it claimed to own the notes. This assignment was with other securities, and it evidently was a step in furtherance of merging the Nineteenth Ward Bank and Fourteenth Ward Bank into the Securities Bank, and is of but little value in determining the controverted question of fact with respect to occurrences nine months before. The defendant also draws attention to the fact that, on the people's theory, the directors of the Nineteenth Ward Bank, of which he was one, violated the law. We refrain from expressing an opinion as to whether the defendant, or any of the officers or directors of the banks or trust companies, contemplated violating or violated the provisions of section 664, subd. 5, of the Penal Law, forbidding a banking institution to use its funds, other than surplus profits, in the purchase of its own capital stock, or of section 665, subd. 2 and 3, with respect to making false reports, or omitting ma-

:terial entries in books or reports, for it might reflect upon parties who have not been heard. Suffice it to say that that would not aid the defendant; for while, as his counsel claims, those who took part may be personally estopped from claiming that the transactions were other than they appear by the records, there is no such estoppel as against the people.

[3] It is also contended that the court should have advised an ac-·quittal on the ground that what was done was done openly and in good faith, and in the belief by the defendant that he had title to the proceeds of the checks, and that therefore, by virtue of the provisions ·of section 1306 of the Penal Law, he was not guilty of larceny. The undisputed evidence shows that this transaction was not open and ·above board. The checks on their face show that they were intended for the Carnegie Trust Company, and yet no entry was made on the records of the Carnegie Trust Company, either of the trust or of that ·company having any interest in the checks.

[4]` There is no force in the contention that the Nineteenth Ward Bank is chargeable with the knowledge, which it might have obtained by examining the vouchers when they were returned, that this money passed to the defendant's individual account. The crime had been ·committed at that time, and the bank was not required to examine ·the return vouchers for such purpose. It is also contended that, if ·there be any evidence that the defendant committed the crime, it was ·not of a character and quality to warrant its submission to the jury, within the rule declared in People v. Ledwon, 153 N. Y. 10, 46 N. E. 1046. There is no merit in this contention. The evidence not only ·required the submission of the case to the jury, but it preponderates in favor of the defendant's guilt.

[5] Error is also predicated on the denial of a motion to take the fourth and sixth counts, which charge larceny from the Nineteenth Ward Bank in the common-law form, and as its agent, bailee, or trustee, from the jury, and on an exception to the charge leaving it to the jury to find whether the defendant was guilty under these counts. The evidence warranted the jury in finding that the defendant induced the Nineteenth Ward Bank to consent that the Carnegie Trust Company act as trustee, having previously formed the intention of misap-·propriating the proceeds of the funds in the manner in which he did; and, if so, that constitutes larceny by what is known as trick and device, within the authorities. Smith v. People of the State of N. Y., 53 N. Y. 111, 13 Am. Rep. 474; Loomis et al. v. People, 67 N. Y. .322, 23 Am. Rep. 123; People v. Morse, 99 N. Y. 662, 2 N. E. 45; People v. Miller, 169 N. Y. 339, 62 N. E. 418, 88 Am. St. Rep. 546; People v. Neff, 122 App.· Div. 135, 106 N. Y. Supp. 747; affirmed 191 N. Y. 210, 83 N. E. 970.

[6] The contention that the defendant was merely a bailee to take the checks to the Carnegie Trust Company, and that, since that·was intended and was done, there can be no crime, is not tenable. The indictment does not confine the charge to stealing the checks. It expressly embraces the *proceeds,* as well, which distinguishes the case from People v. Cruger, 102 N. Y. 510, 7 N. E.· 555, 55 Am. Rep. 830,

in which it was held that a conviction on an indictment for stealing *a check,* title to which the maker intended to part with, could not be had on proof that the defendant appropriated the *proceeds.* No question was raised on the trial with respect to the form or sufficiency of the indictment. The four counts were proper, and there was evidence bearing upon the commission of the crime as charged in each count. It was for the jury to say on the evidence whether the defendant originally formed the felonious intent, or whether he came into the possession of the proceeds intending to carry out the trust, or to apply the funds as intended and subsequently, while having the custody thereof, as agent, bailee, or trustee, misappropriated them. The court did not require the jury to specify the counts on which they found the defendant, guilty, and no request was made for a direction with respect thereto, depending on how they found on the evidence.

[7] It is too late now for the defendant to complain of a general verdict, even if it would have availed him, if timely raised, which is doubtful. See People v. Kerns, 7 App. Div. 535, 40 N. Y. Supp. 243; Rosenstock v. Metzger, 136 App. Div. 620, 121 N. Y. Supp. 52; Guenther v. People, 24 N. Y. 100; Hope v. People, 83 N. Y. 418, 38 Am. Rep. 460. The case of People v. Cohen, 148 App. Div. 205, 133 N. Y. Supp. 103, in so far as it holds that a conviction on a count charging larceny as at common law cannot be sustained on proof that the owner, who *intended to part with his title,* was induced to do so by false pretenses, is not in conflict with our view of this case. Under the clear charge by the learned judge, the jury were plainly informed that, if these checks were issued as a loan of money on the discount of the notes, the defendant should be acquitted, and should be convicted only upon the theory that the money was advanced in trust, or as a special deposit, to purchase the Van Norden stocks, which were then to be held by the Carnegie Trust Company in trust for the Nineteenth Ward Bank, as stated.

[8] The gist of the crime was stealing the money, and it is immaterial whether the jury reached the determination that the moneys belonged to the Nineteenth Ward Bank, or the Carnegie Trust Company, for it was only necessary, to warrant a conviction, for them to find that they did not belong to the defendant, and that he stole or misappropriated them. People v. Mead, 125 App. Div. 7, 109 N. Y. Supp. 163, affirmed 200 N. Y. 15, 92 N. E. 1051, 140 Am. St. Rep. 616; Hope v. People, supra, 83 N. Y. at page 423.

[9] It was proper to charge the crime in different forms in the indictment, and then on the evidence it was for the jury to determine whether, if the defendant stole the money, he stole it by trick and device, or while acting as agent, bailee, or trustee thereof. See People v. Davis, 56 N. Y. 95; People v. Sullivan, 173 N. Y. 122, 65 N. E. 989, 63 L. R. A. 353, 93 Am. St. Rep. 582.

Many other alleged errors are assigned as grounds for reversal, but they are all without substantial merit, and only one is of sufficient importance to be stated and discussed in the opinion. The learned counsel for the defendant contended at the outset that the constitutional rights of his client had been invaded, and that the in-

138 N.Y.S.—34

dictment should have been dismissed, or a nolle prosequi entered, or a new trial granted, and that on a new trial all evidence relating to transactions, concerning which the defendant was compelled to testify before the grand jury, be excluded.

The defendant was arraigned on the indictment and pleaded not guilty on the 21st day of April, 1911. Thereafter, and on the same day, he was subpœnaed to appear before the grand jury, which indicted him, as a witness on an investigation then pending against Charles H. Hyde, the city chamberlain. He obeyed this subpœna, and on appearing was informed by the assistant district attorney that the grand jury was not then investigating any charge against him, but only against Hyde, and that, except in so far as the law with respect to bribery of a public official compels a witness to testify and grants him immunity from prosecution, he had a right to decline to answer on the ground that it would tend to incriminate him in some other manner than on the charge of bribery which the grand jury was investigating. The district attorney then asked the defendant if he understood that the proceeding upon which he was called to testify was one against Hyde for accepting a bribe in violation of section 381 of the Penal Law, which provided that any person offending against the provisions of the chapter of the Penal Law relating to bribery and corruption is a competent witness against any other person so offending, and may be compelled to attend and testify, but that the testimony so given "shall not be used in any prosecution or proceeding, criminal or civil, against the person so testifying," and that a person so testifying to the giving of a bribe, which has been accepted, shall not thereafter be liable to indictment, prosecution, or punishment for that bribery, and may plead or prove the giving of such testimony in bar of such indictment or prosecution, and he answered in the affirmative. After answering preliminary questions, the witness invoked the protection of the Constitution, and refused to testify further. The minutes of the grand jury at this point show the following:

"Q. Now the district attorney of the county makes this statement to you, Mr. Cummins: The stenographer then reads to Mr. Cummins as follows: Now, Mr. Cummins, for the sake of the record, I want to say this: That except so far as your testimony given here and now may concern Mr. Hyde and him alone, the district attorney of this county stipulates that such testimony which you may give here to-day in this proceeding shall not be used against you in any way, shape, or manner. Notwithstanding that stipulation and assurance, and notwithstanding the provision of 381 of the Penal Law, do you still refuse to answer? Mr. Cummins: Yes."

He would not even say whether he declined to answer on the ground that the answers would incriminate or tend to degrade him. A number of questions with respect to a conference with one Robin and said Reichmann, and a conference with Hyde, and a request of Robin for a loan by the Northern Bank to the Carnegie Trust Company, on the understanding that Hyde, as city chamberlain, would deposit city funds with said bank, and a later conference, were asked, all of which he declined to answer. He was then taken before the court, and the proceedings before the grand jury were read, and the

court ruled that the questions were proper, and that further refusal on the part of the witness to answer would be regarded as a contempt, and thereafter he answered them and other questions of like import. When his further examination was then about to be postponed until a later date, for which he had been subpœnaed, and he was asked, in substance, if that would be convenient for him, he answered:

"Yes; because I am subpœnaed Monday, and, if there are any other questions, I would be glad to answer them, because I have been given permission now."

When the examination was resumed, his attitude had evidently undergone a change, for he then refused to testify, excepting with respect to the *particular* questions he had been ordered to answer, and he specifically declined to answer whether the Carnegie Trust Company needed $130,000 to make its reserve fund sufficient under the law at the time referred to, when he was asked about endeavoring to get a loan from the Northern Bank, on condition that Hyde deposit an equal or greater amount of city funds with it. He thereupon declined to answer numerous questions relating to the same transactions, on the ground that they were not the particular questions he had been directed to answer, and that his answers would incriminate and degrade him; but finally he commenced to answer, and stated that on or about the 22d day of August, 1910, at an interview between Robin and Reichmann, it was arranged that the Northern Bank would loan $130,000 to the Carnegie Trust Company, and that he expressed to Robin his appreciation therefor, and arranged by telephone to have Robin meet Hyde at the latter's office, and a few minutes later joined Robin, Reichmann, and Hyde there.

In the course of this examination the defendant repeatedly refused to answer questions on the ground that they had been already answered, and, when asked if he refused on the ground that the answers might incriminate or degrade or disgrace him, he said:

"There is no chance to degrade me or incriminate me on this."

He was also asked about an attempt to procure a loan for himself, for some of his associates, and for concerns in which he was interested, from the National Reserve Bank, the Hungarian American Bank, the Empire Trust Company, the Savoy Trust Company, and the Trust Company of America, on condition that he would obtain for them deposits of city funds, and he declined to answer. On being taken before the court again, he was directed to answer; and on reappearing before the grand jury, he was asked and testified with respect to these matters and with respect to requesting the city chamberlain to deposit municipal funds with the Madison Trust Company, the Twelfth Ward Bank, the Nineteenth Ward Bank, the Carnegie Trust Company, and the Fourth National Bank.

[10] When the indictment was moved for trial, the defendant moved for its dismissal, on his affidavit charging that compelling him so to testify was a violation of his constitutional rights. His testimony before the grand jury, and an affidavit of the assistant district attorney who conducted the examination, showing in substance that nothing was

disclosed by the defendant's examination that was not already known to the district attorney, and that no use had been made of it in preparing the case for trial, were presented to the court, and the motion was denied. That ruling manifestly was right.

[11] Even if the defendant, after the indictment was found, was compelled to testify in violation of his constitutional rights, that was no ground for dismissing the indictment. His only remedy was to refuse to answer, and sue out a writ of habeas corpus to have his rights authoritatively determined, or to object to the use of his testimony or any evidence taken from him on any trial against him.

[12] We agree with the contention of the learned counsel who filed a brief on the constitutional question that the provision of section 6 of article 1 of the Constitution of the state of New York that "no person * * * shall be compelled in any criminal case to be a witness against himself," which is identical with the provision of article 5 of the amendments to the federal Constitution, was designed, not only to protect every person against being directly compelled to testify, and the use of his testimony against himself, but also against being compelled in any judicial proceeding or action, civil or criminal, whether directed against him or another, either as a party or as a witness, to give or disclose any evidence, or information by which evidence may be obtained, for use against him, with respect to any criminal offense, unless he has been given full and complete immunity against prosecution therefor; and this court in People ex rel. Lewisohn v. O'Brien, which, however, arose on habeas corpus (81 App. Div. 51, 80 N. Y. Supp. 816, affirmed 176 N. Y. 253, 68 N. E. 353), following the decisions of the United States courts construing the corresponding provision of the federal Constitution, and decisions of the highest courts of the sister states, construing similar constitutional provisions, adopted and applied the rule, notwithstanding the decision in People ex rel. Hackley v. Kelly, 24 N. Y. 74, which the Court of Appeals, in affirming our decision, overruled.

Any testimony forced from the defendant, or evidence obtained from him before the grand jury, over his constitutional objection, was therefore inadmissible, and, if received over proper objection, it would be the duty of the appellate court to set aside the conviction. People v. Gillette, 126 App. Div. 665, 111 N. Y. Supp. 133. In the case at bar, no testimony given by the defendant before the grand jury, or evidence obtained from him, either voluntarily or involuntarily, was offered or received in evidence. There was offered and received in evidence, independently and without referring to his testimony before the grand jury, evidence with respect to his transactions with the National Reserve Bank, the Savoy Trust Company, the Hungarian American Bank, the Fourth National Bank, and the Fourteenth Street Bank, concerning which he was interrogated before the grand jury; but this was after his counsel had upon the trial, as has been stated, given the district attorney a statement in writing of his transactions with these various banks, is so far as they related to the fund in question and the collateral released by the use thereof, and after his counsel had stated to the court that he proposed to trace all of these matters.

[13] The only objection interposed to this evidence was that it was immaterial and irrelevant. This did not bring to the attention of the court the constitutional objection urged on the appeal. Moreover, the evidence was both relevant and material, for it tended to show the defendant's motive and intention in originally obtaining the checks and their proceeds. Furthermore, the record shows that the learned trial justice did not, in receiving this evidence, intend to rule that it did not come within the constitutional protection afforded to the defendant; for later on, when this specific objection was interposed, evidence of that nature was excluded. It is not claimed that, after this ruling, any motion was made to strike out the other evidence.

[14] The argument in behalf of the defendant on the constitutional question goes to the extent that, if the defendant was compelled to give any testimony in violation of his constitutional rights, the people are thereby precluded from proving the facts with respect to which he was interrogated, even though they were in possession of the facts before he was examined; for it has not been shown that the district attorney used the information which he obtained by the examination of the defendant. That would extend the construction of the Constitution far beyond any authoritative decision, and would in my opinion contravene public policy. If this contention were sustained, then every time a mistake is made by a prosecuting officer in examining a witness, whose evidence discloses that he has committed a crime, or by a court in erroneously ordering a witness to answer a question in a civil or criminal proceeding or action, and the commission of a crime is thus revealed, the witness is immune from prosecution, upon the ground that the commission of the crime, or the evidence thereof, or means by which it could be proved without directly using the evidence improperly drawn from the witness, might not have been otherwise discovered. The theory upon which a *witness* in an action or proceeding, civil or criminal, in the absence of a special statutory enactment requiring him to answer and giving him full immunity, is not required to answer, and, if erroneously so required, is discharged on a writ of habeas corpus from any prosecution for contempt, is that, notwithstanding the constitutional provision which protects him, in any prosecution for the crime, against his testimony being offered in evidence, he may nevertheless be prejudiced by being compelled to disclose information which will enable the prosecution to obtain other witnesses or evidence against the use of which the Constitution would not protect him, and upon which he may be convicted. Counselman v. Hitchcock, 142 U. S. 547, 564, 12 Sup. Ct. 195, 35 L. Ed. 1110; People ex rel. Lewisohn v. O'Brien, supra.

It was entirely competent, therefore, to prove by other witnesses or evidence the transactions concerning which the defendant testified before the grand jury. It is not contended that the district attorney was authorized to grant the defendant immunity, and it is evident that the defendant did not rely on the offer made by the district attorney. This indictment had first been found against the defendant, and numerous other indictments were pending against him. Of course, the district attorney did not intend to use the defendant as a witness against Hyde

and dismiss these indictments, and the defendant had no reason to believe that such was his intention. There is no evidence that the promises made by the district attorney to the defendant, even though not binding on the people, were violated either in letter or in spirit.

The defendant was properly convicted, and the judgment should be affirmed.

INGRAHAM, P. J., and SCOTT, J., concur.

INGRAHAM, P. J. I entirely concur in the opinion of Mr. Justice LAUGHLIN, and only wish to add a few words upon the claim by the defendant that in some way in this action he was compelled to give evidence against himself which would invalidate his conviction. The constitutional provision which it is claimed was violated is contained in section 6, art. 1, of the Constitution and provides:

"No person shall be subject to be twice put in jeopardy for the same offense, nor shall he be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of law."

This provision was adopted to maintain and enforce one of the fundamental provisions of the English common law, that a person could not be convicted of a crime except upon independent proof of the facts to justify a conviction. As I understand the position taken by the learned counsel for the defendant, it is not claimed that he was called as a witness by the people on the trial of this case, or compelled on the trial to give evidence against himself, nor was any testimony that he had given in any other action or proceeding introduced as evidence against him. This provision of the Constitution, therefore, was not violated by the learned judge who tried this case in any particular, and therefore there was no error committed by which the defendant's rights under this provision of the Constitution were impaired or affected.

After this indictment was found, and the defendant had pleaded to it, he was called before the grand jury to testify as a witness for the people in a charge of bribery against Hyde, and, assuming that he was compelled to answer questions which he was justified in refusing to answer, it is difficult to see what effect such a condition could have upon the subsequent trial under this indictment, where the people neither proved nor offered to prove the testimony the defendant had given before the grand jury in the Hyde investigation. If the defendant was improperly ordered to answer questions before the grand jury in the Hyde investigation, he could have refused to answer, and had the question as to whether he could be compelled to answer tested by a proceeding instituted for that purpose; but he acquiesced in the ruling of the court that the questions were proper, and answered them. Such questions, so far as appears by the record, had nothing to do with the question that was being tried upon the indictment in this case, as the crime under investigation by the grand jury was one entirely distinct from the crime charged under this indictment. This objection was really a claim that in some way

the defendant was entitled to immunity from this crime because the court compelled him to testify in the Hyde investigation. It is not claimed that the district attorney promised him such immunity, and no statute or rule of law is cited which would produce that result. The defendant was entitled to immunity from a charge of bribing Hyde; but that was the extent to which his answering the questions before the grand jury could go, and there was nothing which could justify the court on the trial of this case giving the defendant immunity and discharging him.

I therefore concur in the affirmance of this judgment.

MILLER, J. I concur in the result reached, as well as in the opinion of Mr. Justice LAUGHLIN, except as to the constitutional question involved; and upon that point I concur in the affirmance of the judgment, upon the ground that the evidence now complained of was received without objection upon the trial.

DOWLING, J., concurs.