MADISON TRUST CO. v. CARNEGIE TRUST CO. et al.   (No. 6636.)

(Supreme Court, Appellate Division, First Department.   March 26, 1915.)

1. BANKS AND BANKING ⬦⟿315—POWER TO ACT AS TRUSTEE.
    Laws 1887, c. 546, under which a trust company was organized, authorized it, by section 21, subd. 11, to purchase, invest in, and sell stocks and bonds, and, when moneys were borrowed or received on deposit, bonds or obligations of the company might be given therefor.   The trust company agreed to receive moneys, and with them to purchase stocks of other companies, and to hold the unexpended funds and stock acquired in trust.   Held, that the trust was within the power of the company.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1219–1221; Dec. Dig. ⬦⟿315.]

2. BANKS AND BANKING ⬦⟿315—EXECUTIVE COMMITTEE—POWER OF DIRECTOR.
    A director, who was a member of the executive committee of a trust company, and as such practically dominated its policy, has sufficient power to accept for the company an agreement that it should act as trustee in holding funds on deposit and acquiring the stock of other companies.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1219–1221; Dec. Dig. ⬦⟿315.]

3. BANKS AND BANKING ⬦⟿315—TRUST COMPANIES—POWER OF VICE PRESIDENT.
    The vice president of a trust company, who was authorized to act in the president's absence, could accept for the company an agreement that it should receive a deposit and expend the same in acquiring named stocks.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1219–1221; Dec. Dig. ⬦⟿315.]

4. BANKS AND BANKING ⬦⟿315—TRUST COMPANIES—LIABILITY.
    Where a trust company agreed to receive funds and hold them in trust to acquire stocks, the fact that checks for the funds were transferred· to

one of its directors does not change the liability of the company as trustee.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1219–1221; Dec. Dig. ☞315.]

5. BANKS AND BANKING ☞317 — TRUST COMPANIES — CREDITORS — PREFERENCES—TRUST FUNDS.

Laws 1892, c. 689, known as the Banking Law, which repealed and practically re-enacted earlier laws as to trust companies, authorized, by section 156, such companies to act as trustees of almost all kinds of trusts. Section 158 declared that no bond should be required from any such corporation in respect to any trust, nor when appointed executor, administrator, guardian, receiver, etc., but that for all losses of such money its capital stock should be absolutely liable, while, if dissolved, debts due as executor, etc., should have a preference. These provisions were continued in the Consolidated Laws; Banking Law (Consol. Laws, c. 2) § 190, declaring that, if dissolved by the Legislature, or court, or otherwise, debts due from a trust company as executor, administrator, guardian, trustee, etc., should have the preference, and that the court or officer making the appointment might require any company so appointed to give security which the court or officer might deem proper. *Held* that, as to a trust not created by virtue of judicial appointment, the statute did not give the beneficiary any preference.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1222; Dec. Dig. ☞317.]

6. BANKS AND BANKING ☞317—TRUST COMPANIES—CREDITORS—TRUSTEES—PREFERENCE.

Where a trust company, which had large deposits and agreed to receive portions of the deposits on a special trust, misapplied the funds, so that the trust property could no longer be traced or identified, the beneficiaries were not entitled in equity to any preference over the company's general creditors.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1222; Dec. Dig. ☞317.]

7. TRUSTS ☞375—TRUSTEE—LIABILITY.

Where a trustee of an express trust misapplied the funds, not using them for the purpose for which they were intended, the beneficiary, the trust having been established, is entitled to a money judgment against the trustee.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 613, 615, 616; Dec. Dig. ☞375.]

Ingraham, P. J., and Scott, J., dissenting.

Appeal from Special Term, New York County.

Action by the Madison Trust Company against the Carnegie Trust Company and George C. Van Tuyl, as Superintendent, etc. From judgment for plaintiff, defendants appeal. Modified and affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Joseph A. Kellogg, of Glens Falls, for appellants.
John Quinn, of New York City, for respondent.

HOTCHKISS, J. The action is in equity to adjudge that a trust exists with respect of certain moneys of the plaintiff, the Madison Trust Company, successor to the Van Norden Trust Company; for an accounting and the delivery of certain stocks, if any, that may have

been purchased with said moneys: for a judgment for the amount of any such moneys remaining unexpended, and that plaintiff's claim therefor be preferred over the claims of general creditors of the insolvent Carnegie Trust Company.

No stocks having been purchased, the respondent has recovered a money judgment for the full amount of its claim, with interest from the date on which preferred claims against the insolvent Carnegie Company were paid in full, which judgment the superintendent of banks is directed to satisfy out of the moneys in his hands as liquidator of the latter company.  In certain respects, the present case and that of McGrath, an action in similar form in which a similar judgment was rendered against the same appellants, and the appeal in which was heard at the same time, depend upon substantially the same facts, while in other respects they are different.  Many of the material facts common to both cases were fully developed on the trial of William J. Cummins, who was indicted and convicted of the crime of grand larceny for having obtained by trick and device from the Ninteenth Ward Bank the checks, or the proceeds thereof, which are the subject of the McGrath action, and which proceeds Cummins appropriated to his own use.  This conviction was affirmed by this court (People v. Cummins, 153 App. Div. 93, 138 N. Y. Supp. 517), and by the Court of Appeals (209 N. Y. 283, 103 N. E. 169).

To analyze in minute detail the evidence contained in the voluminous records before us, and to discuss its weight, as bearing upon the determinative facts involved, would extend an expression of my views to an impracticable length.  Suffice it to say that I have with care examined the facts as disclosed at the trial, and have considered the arguments of the respective counsel with respect thereto, and that I am convinced that the findings of the trial court on the material questions of fact involved were right, in which judgment I am confirmed by the examination made by this court of substantially the same facts as they appeared in the Cummins Case.  For the sake of brevity, I shall proceed to state only those facts which I deem to be fully established and of material importance in the determination of the questions of law which I consider to be sufficiently serious to warrant discussion.

At the time of the occurrences in question, Crockett was president of the Van Norden, and Martin was its vice president and treasurer. Martin was as well president of the Nineteenth Ward Bank, of which Cummins and Condon were directors.  Martin was also an officer of the Twelfth Ward Bank; the two banks and the Van Norden, because of the identity of their largest stockholders and as well a number of their respective directors, being closely affiliated in interest, and in all of which concerns Warner Van Norden and Warner M. Van Norden had a large interest.  Reichman, Cummins, Moore, and Condon were directors of the Van Norden, and were also large stockholders and directors of the Carnegie, of which Reichman was president, one Smith a vice president, Cummins and Reichman members of its executive committee, and, with Moore, members of its board of directors.  Cummins was undoubtedly the controlling spirit of the Carnegie, and the one who commonly represented it in affairs of first importance.  Under the by-laws of the Carnegie, the president had power "to transact any business

for the benefit of the corporation authorized by the charter." He was also empowered to delegate his authority to any of the officers. A general by-law provided that:

"In all cases where the duties of" officers other than the president, "and the agents and employés of the company are not specifically prescribed by the by-laws or by resolution of the board, they shall obey the orders and instructions of the president."

The by-laws also provided:

"In case of the death, absence or inability of the president, all his duties may be exercised  *  *  *  by the active vice presidents in the order of their election, and that the officers shall perform such other duties as may be assigned to them from time to time by the board or the executive committee."

Smith, as vice president, had general supervision of all the departments into which the business of the Carnegie Company was divided. In April, 1910, Cummins, Reichman, Moore, and Condon were indebted to the Carnegie in a large amount for loans which they had procured for the benefit of enterprises in which they were individually interested. These loans, known in the record as "directors' loans," had been severely criticized by the superintendent of banks, who shortly prior to the 15th of April, 1910, had begun an investigation of the Carnegie. At this time the two Van Nordens had outstanding in various New York banks loans aggregating about $575,000, for which they had pledged as collateral a large number of shares of the Nineteenth Ward and the Twelfth Ward Banks, the holders of a number of which loans were pressing for payment. In this situation, Cummins, in behalf of himself and associates, took an option from the Van Nordens to buy their stock. On the trial, the appellants sought to show that Martin became a member of the Cummins syndicate, formed to buy these stocks, and the fact that he subsequently did invest $100,000 in their purchase is appealed to as evidence of such membership; but Martin denied that he ever became a member of the pool, and on this and much circumstantial evidence the court found against the appellants.

On April 18th Cummins applied to Martin for loans on behalf of himself and certain other members of the Van Norden stock syndicate, which loans were to be represented by the unsecured notes of the borrowers; but Martin declined, presumably in behalf of both the Van Norden Company and the Nineteenth Ward Bank, to favorably consider the proposed loans, because no collateral was offered therefor. On April 19th Cummins, Reichman, Moore, and Condon were present at a meeting of the Van Norden directors. At this meeting Cummins stated the critical situation of the Messrs. Van Norden's loans and of the apprehended sale of the collaterals therefor, and he impressibly bore on the embarrassment to the three Van Norden institutions (the trust company and the two banks) which would probably follow the publicity incident to default on the notes and a sale of the collaterals, to avoid which Cummins stated it was the purpose of himself and his associates to exercise their option to buy the Van Norden stock, to assist them in which purpose they wanted to borrow money from the Van Norden Company on the notes of the borrowers, the proceeds of such notes to be paid to a trustee, who would purchase or supervise the

purchase of the stock, and either hold the certificates for the benefit of the Van Norden Company or turn them over to it as security for the notes. The Van Norden board regarded this proposition with favor, and at this meeting several individuals were suggested as trustee, but they each declined.

At this same meeting the board passed a resolution authorizing loans of $75,000 to Condon, and $60,000 to Reichman and Moore severally, "subject to the approval of the officers," meaning that the latter should pass on the trustee, the form of the trust agreement, and other incidental details. On April 20th there was a directors' meeting of the Nineteenth Ward Bank, of which, as I have said, Cummins was also a director. Just previous to this meeting Cummins asked Martin if the bank would make loans for purposes similar to the loans arranged to be made by the Van Norden and under similar conditions; but Martin objected, on the ground that his bank could not lawfully loan on its own stock, but at the same time he expressed a willingness to make loans of the character requested, if this difficulty could be overcome. At the subsequent meeting of the directors Cummins made a statement to the board similar to that which he had addressed to the Van Norden board on the day before, and loans were approved by a resolution in substantially the same form as that which had been passed by the Van Norden Company. A day or so after, Cummins asked Martin if it would be satisfactory to have the Carnegie Company act as trustee for the loans authorized by both institutions, to which Martin assented. Cummins also asked if the Nineteenth Ward Bank would accept Carnegie stock as part collateral for its proposed loans in lieu of Nineteenth Ward Bank stock, and if the note of the Merchants' & Manufacturers' Securities Company would be accepted, instead of his (Cummins') note, to both of which propositions Martin assented. Crockett, on behalf of the Van Norden, similarly assented to accept Carnegie stock as part collateral for the loans proposed to be made by the former company.

I have thus briefly, omitting many matters, which I do not regard as material ultimate facts, brought the transactions down to the actual execution of the papers signed in behalf of the Carnegie Company, and which are claimed to evidence the trusts for the benefit of this respondent and of McGrath. The several instruments are written on Carnegie Company letter heads. One is addressed to Crockett, as president of the Van Norden Company, and is dated April 20th, and the other is addressed to Martin, as president of the Nineteenth Ward Bank, and is dated April 23d. The text of the two is identical, except as to the borrowers, the amount and description of the notes, and is as follows:

"We acknowledge receipt hereof from the        of $     , the proceeds of the following notes: [Describing them.] The above amount to be used by us toward the payment of Carnegie Trust Company stock at $175, Nineteenth Ward Bank stock at $250, Twelfth Ward Bank stock at $100. We agree to hold in trust for you, or any trustees named by you, the above collaterals as paid for by us at prices mentioned above. Whatever part of the above amount is not employed in the purchase of the above stocks shall be subject to your order at any time.

"Yours very truly,                    R. L. Smith, Vice President."

In the copy addressed to the Van Norden Company, the notes are recited to aggregate $195,000 and to be as follows:

| | | |
|---|---|---:|
| Demand note of Martin J. Condon | | $75,000 |
| " " " Joseph B. Reichman | | 60,000 |
| " " " Charles A. Moore, Jr. | | 60,000 |

In the copy addressed to the Nineteenth Ward Bank the aggregate of the notes is $210,000, and the notes are as follows:

| | | |
|---|---|---:|
| Demand note of Joseph B. Reichman | | $70,000 |
| " " " Charles A. Moore, Jr. | | 70,000 |
| " " " Merchants' & Manufacturers' Securities Company | | 70,000 |

By the agreement with the Nineteenth Ward Bank, no stock of that institution was to be offered to or accepted by it, and the mention of such stock in the letter addressed to it as part of the proposed purchase and collateral was an inadvertence on the part of the draftsman of the letter. It is also conceded that no note of Reichman was ever offered to or taken by the Nineteenth Ward Bank. At the trial there was considerable controversy over the authorship of this letter, and the exact circumstances under which Smith attached his signature thereto; but the evidence is preponderating that the letter was dictated by William J. Cummins or at his direction, and was signed by Smith at the Carnegie banking house. On April 21st Cummins and Moore delivered to Crockett the trust letter addressed to him, together with Moore's note for $60,000 and Reichman's note for a similar amount, and thereupon Crockett delivered to Cummins two checks for $60,000, each to the order of the Carnegie Company. On the following day, April 22d, there was delivered to the Van Norden Company Condon's demand note for $75,000, and thereupon that company handed to the Carnegie's messenger its check to the order of the Carnegie Company for $75,000. On April 23d the trust letter addressed to Martin as president of the Nineteenth Ward Bank was delivered to him by a messenger from the Carnegie, and in the same inclosure were the notes of Moore and the Merchants' & Manufacturers' Securities Company, for $70,000 each, and thereupon there was delivered to the messenger, and subsequently received by the Carnegie office, the four checks of the Nineteenth Ward Bank to the order of the Carnegie, aggregating $140,000.

The learned counsel for the appellants seeks to persuade us that the execution and delivery of these several trust letters was a mere pretext; that there never was any bona fide arrangement on the part of the representatives of either the Van Norden Company or the Ninteenth Ward Bank to make collateral loans to the borrowers whose notes they had accepted as above recited, but that, on the contrary, the subjects of collateral, proposed trusts, and other details of secured loans were but a sham, and that the purpose and intent of both of the above lending institutions was to provide Cummins, alone or in conjunction with his above associates, with funds by the use of which the apprehended danger to said institution arising from the perilous state of the loans of the Messrs. Van Norden would be tided over until some permanent arrangement for protecting the situation could be found; also, as I understand it, that at the time the loans evi-

denced by said checks were made, all or some of the Van Norden institutions were heavy depositors in the Carnegie, which itself was not only under examination by the superintendent of banks, but under suspicion in the community as well, and that if such was not their main purpose, there was at least no disposition on the part of said lending institutions to object if Cummins made use of a portion of said loans for the purpose of reducing or temporarily adjusting some of the Carnegie's "directors' loans" which were then the subject of criticism. Of this contention, I may repeat what I have in effect said in the early part of this opinion, that not only has the learned trial justice arrived at a different conclusion from that contended for by counsel, but that the same result was, in the case of the Nineteenth Ward Bank loan, reached by the jury and affirmed by this court in the Cummins Case.

The two checks for $60,000, which Cummins had procured from Crockett on April 21st, were taken by him to Reichman's office in the Carnegie Company and were by the latter turned over to Vice President Smith, who, by Reichman's instructions, indorsed them payable to the order of Moore, "Carnegie Trust Company, R. L. Smith, Vice President." On the next day, on the receipt at the Carnegie's office of the Van Norden's check for $75,000, covering the Condon note, Smith, under practically the same circumstances, indorsed the check in similar manner payable to the order of W. J. Cummins. At the time of giving such instructions to Smith, Reichman explained to him that the several checks were the proceeds of the individual notes of Moore and Cummins, and that they were personally entitled to the benefit of the checks. After their indorsement as aforesaid, the two checks indorsed to Moore were by him indorsed and deposited to the credit of his account in the Carnegie Company, and the check indorsed to Cummins was by him indorsed and credited to his account in the same institution. All three checks were thereafter indorsed in the name of the Carnegie Company by R. B. Morehead, secretary, were paid to that company by the several banks on which they were drawn, and were in due course returned to the Van Norden Company among its paid vouchers. On receipt by the Carnegie Company of the several checks of the Nineteenth Ward Bank payable to its order, the same were, under Reichman's instructions, indorsed in its name by Smith, vice president, above which indorsement was written, "For credit account W. J. Cummins." Subsequently each check was indorsed, "For deposit W. J. Cummins," and was carried to the credit of the latter's account in the Carnegie Company, and thereafter was indorsed in the name of that company by Morehead, its secretary, and was collected by that company from the several drawees, and was returned to the Nineteenth Ward Bank among its paid vouchers.

It is conceded that the Carnegie purchased no stock with the proceeds of any of the aforesaid checks, which by the several aforesaid indorsements, immediately upon their receipt by the Carnegie Company, were wholly diverted from the purpose expressed in the several trust letters, of which facts the Van Norden Company and the Nineteenth Ward Bank were ignorant until or shortly before Janu-

ary 7, 1911, when the Carnegie closed its doors. There is no find-ing by the court below of the history of the funds representing any of the checks subsequent to their being carried to the credit of Moore and Cummins on the Carnegie Company's books, but the evidence justified this court in finding that Moore transferred to Cummins the proceeds of the two checks deposited to his credit, thus making Cummins the ultimate recipient of $335,000, the aggregate of the pro-ceeds of the notes. By an intricate analysis of Cummins' account in the Carnegie, the learned counsel for the respondent (Madison-Van Norden Company), and with apparent success, shows that upwards of $200,000 of these moneys was used by Cummins to pay "directors' loans" held by the Carnegie Company, of which practically $150,000 represented Van Norden moneys and $50,000 the moneys of the Nine-teenth Ward Bank.

Were it necessary, I should advise this court to find as a fact that the aforesaid amounts paid on account of "directors' loans" was a portion of the proceeds of the checks in question and was used for the Carnegie's benefit. But inasmuch as, in the view I take of the case, such a finding would be immaterial, there is no occasion to make it.

[1-3] First. Was there a trust? The Carnegie Company was or-ganized under the general act of 1887 (chapter 546), which I hereafter show was, so far as powers conferred are concerned, practically the same as the present Banking Law (Consol. Laws, c. 2). That the part to be undertaken by the Carnegie Company, as evidenced by the trust letters, was within its general powers, cannot be seriously questioned. In addition to the almost unlimited kinds of trusts which the act of 1887 empowered companies organized thereunder to execute, section 21, subd. 11, authorized them to—

*"purchase,* invest in, and sell stocks, bills of exchange, bonds and mortgages and other securities; and when moneys or securities * * * are borrowed *or received on deposit,* * * * bonds or obligations of the company may be given therefor. * * * "

It will be noted that the language is not to purchase for investment, from which, of course, an implied authority to sell would follow, but is "to purchase, invest in, and sell stocks," and as well to receive the same on deposit, which were the only acts the company assumed in this instance to do. Nor, as I think, can it be doubted that the trans-action, so far as the Carnegie was concerned in it, was negotiated and consummated by officers acting within the scope of their authority. At the meeting of the Van Norden board on April 19th, Reichman and Cummins arranged with the directors of that institution for the essential features of the proposed loans and the purposes for which the same were to be used through the medium of a trustee, whose business it would be to see that the moneys were applied to the pur-pose for which they were to be borrowed, and to hold the purchased shares for the lenders' benefit. This arrangement was subsequently consummated by delivery to the Van Norden of the letter signed by Smith, vice president of the Carnegie Company, acting under the instructions of Cummins, and in pursuance of the relations previ-

ously arranged for, and now formally evidenced by this letter, the Van Norden gave its checks to the order of the Carnegie Company. Except for the nonappearance of Reichman in the transaction, the checks secured from the Nineteenth Ward Bank were obtained by Cummins under circumstances practically identical with those under which the checks of the Van Norden were obtained.

Much has been made of the fact that Cummins held no titular office in the Carnegie Company. In this case there is no need to invoke Cummins' authority, because the loans made by that company were in effect negotiated when Reichman was present, and they may be assumed to have had his approval. But we would be closing our eyes to what has been for years notorious if we failed to take notice of the important part taken by the executive committee in the business of the numerous trust companies where such committees exist. It has been found that Cummins, a member of the executive committee, commonly represented the Carnegie in transactions of importance, and, from this fact alone, we may infer that his authority was sufficiently broad to cover an agreement for its acceptance of the duties imposed upon it by the oral arrangement entered into when the loan itself was agreed upon and evidenced later by the letters signed by Smith. Chambers v. Lancaster, 160 N. Y. 342, 54 N. E. 707; Young v. U. S. Mtg. & Trust Co., 108 N. E. 418.

If the proposed loans and the conditions agreed upon with respect to the security to be given by the borrowers and the relation which the Carnegie Company was to bear thereto, had been evidenced by nothing more than these verbal agreements made by Reichman and Cummins with the Van Norden, and by Cummins with the Nineteenth Ward Bank, consummated by delivery through Cummins and Reichman of the notes of the borrowers and the almost simultaneous delivery of the checks of the lenders to the officers of the Carnegie Company, there would, in my opinion, have been as ample and sufficient a trust as if the agreement had been reduced to writing in the most formal manner. The trust letters signed by Smith created no relation between the parties that was not already in law established by their verbal agreement and their acts. Smith's letters in fact created nothing, and were merely evidence of matters already undertaken by his superiors. But, assuming that the transaction originated with Smith and that his letter was evidence of acts, the responsibility for which must rest with him alone, I think his power to bind the Carnegie was complete. Its duties in the premises were of the simplest character, and were not only within its chartered powers, but were of so ordinary a nature that we may almost take judicial notice of the frequency with which such or similar duties are undertaken by trust companies. Under these circumstances I think the Carnegie was bound by Smith's signature. Young v. U. S. Mtg. & Trust Co., supra; Patterson v. Robinson, 116 N. Y. 193, 22 N. E. 372; Martin v. Niagara Falls Mfg. Co., 122 N. Y. 165, 25 N. E. 303; Oakes v. Cattaraugus Water Co., 143 N. Y. 430, 436, 38 N. E. 461, 26 L. R. A. 544.

As I construe the several trust letters, the duties of the Carnegie were perfectly clear. Having received the proceeds of the notes made

by the individual borrowers, it was bound to use the same in the purchase of the specified stock. As and when the fund was appropriated to the purchase of the shares, they were to be automatically substituted for so much of the fund as was thus expended, and at all times the fund, or its avails plus the unexpended balance, was, if the Carnegie kept its engagements, to be found in its safe-keeping as security for the several notes. The transaction was in no sense between the lending institutions and the Carnegie Company as bank and depositor. The clear purpose was to provide a fund for the purchase of certain shares of stock, which fund or the shares were at all times to be held by the Carnegie for the benefit of the lending institutions. Under these circumstances, a trust was created. People v. City Bank of Rochester, 96 N. Y. 32; Straus v. Tradesmen's Nat. Bank, 122 N. Y. 379, 25 N. E. 372; Haight v. Haight & Freese Co., 112 App. Div. 475, 98 N. Y. Supp. 471, affirmed 190 N. Y. 540, 83 N. E. 1126; People v. Cummins, supra, 153 App. Div. 105, 138 N. Y. Supp. 517.

[4] Second. Conceding the trust, is the situation changed because of the fact that on receipt of the checks by the Carnegie they were at once indorsed away, so that the proceeds went directly to Cummins? I confess I see nothing in this point. By making the checks payable to the order of the Carnegie and delivering them to that company, the lenders passed to it complete control of the checks, the proceeds of which then became available to it, and responsibility for their subsequent disposition rested upon it alone. Whether its faithless officers, making use of their power to indorse the Carnegie name, thus diverted the checks or their proceeds, or whether the moneys, having been paid by the drawees in cash over the counter to these same officers, had been by the latter converted to their own use, were contingencies of equal immateriality so far as the drawers of the checks were concerned. The latter method of receiving the funds would have been an actual collection thereof; the former, being the method pursued, was a constructive collection. In legal result, I can see no difference between them. To say that the whole transaction was conceived in fraud by Cummins, alone or in conjunction with other directors of the Carnegie, including Reichman, its president, and that it was but a scheme on their part to defraud the two lending institutions and the Carnegie as well, affords no means of escape for the latter, for, even if the Carnegie was used as a stalking horse, so long as the transaction was within its powers and was one which its officers had authority to enter into on its behalf, the innocent sufferers from the fraud are entitled to relief.

[5] Third. Is the debt preferred (1) by statute? This question involves an inquiry into the history of sections 189 and 190 of the Banking Law of 1909. The first legislation I find on the subject is Laws of 1885, c. 425, by which it was provided that any court having jurisdiction to appoint trustees, guardians, receivers, committees, or other fiduciaries, might appoint any trust company which had been designated as a depositary of court funds. Any company so appointed might act, "without giving security or upon giving such security as the said court shall direct," and if the appointment was originally

made without security, the court might thereafter require security.

The first general act for the organization of trust companies was Laws of 1887, c. 546. Among the powers conferred by section 21 of that act upon companies organized thereunder were the following: To receive deposits of trust moneys, securities, etc., and to act as trustee, of trusts of an almost unlimited description, whether created by deed, will, or less solemn instrument, or arising under court appointment. They were also made eligible for appointment as executor, administrator, guardian, committee, receiver, and to other offices of jurisdictional trust. Section 26 of the act was in a general way similar to section 158 of the act of 1892, to which I am about to refer.

Chapter 425 of the Laws of 1885, and as well all of the general law of 1887 for the organization of trust companies (except section 34, which has no application to the present question), were repealed by Laws of 1892, c. 689, known as the Banking Law. Article 4 of this act provided for the organization of, and all details concerning the powers and management of, trust companies. By section 156 they were given trust powers which, so far as the present case is concerned, are practically the same as those conferred by the general act of 1887. By section 157 provision was made for the issuing to them of letters testamentary and of administration, and for their appointment by "any court having jurisdiction" as trustee, guardian, receiver, or committee, or to "any fiduciary appointment." The same section also provided that moneys paid into court may be deposited with a trust company. Section 158 read as follows:

"No bond or other security, except as hereinafter provided, shall be required from any such corporation for or in respect to any trust, nor when appointed executor, administrator, guardian, trustee, receiver, committee or depositary. All investments of moneys received by any such corporation in either of such characters shall be at its sole risk, and for all losses of such money the capital stock, property and effects of the corporation shall be absolutely liable. If dissolved by the Legislature, or the court, or otherwise, the debts due from the corporation as such executor, administrator, guardian, trustee, committee or depositary, shall have the preference."

By the same section, a trust company appointed by the court to any fiduciary office as above described may be required to give security, if so ordered, and is otherwise made amenable to the orders of the court in the premises.

Reading the foregoing, particularly in the light of the fact that no security was by law required of any trustee, whether corporate or otherwise, appointed by will, by deed of appointment, or other voluntary instrument, it seems clear that up to this period of the legislation on the subject, the only class of trusts, the debts owing on account of which there preferred in case of the insolvency of a trust company, were such as arose from judicial order. Nor can I see any sound reason for a preference being extended to debts arising from other classes of trusts, because, in such cases, not only was the selection of the trustee a matter entirely within the control of those making the appointment, but it was optional in the case of all such trusts for those who created them to demand any security they pleased as a condition of any trust company accepting the proposed trust.

Sections 157 and 158 aforesaid were repeatedly amended before they, together with the rest of the Banking Law of 1892, were repealed and re-enacted as part of the Consolidated Laws of the state (Laws 1909, c. 10, art. 5), which latter act was in force when the Carnegie Company failed. Although, as incorporated into the Consolidated Laws, the old sections of the Banking Law of 1892 were somewhat broken up by rearrangement and were in some respects changed, I cannot find that there was any such alteration as would indicate a change of policy or an intention to extend a preference to all classes of trusts in the event that a trust company became insolvent.

Section 189 of the Banking Law, as it appeared in the Consolidated Laws, is in substance section 157 of the former law, and section 190 is in substance the same as former section 158. Section 189 provides that a trust company may be granted letters testamentary when nominated as executor in any will; that letters of administration with the will annexed, or otherwise, may be issued to it, as well as letters of guardianship of the estate; that it may by any competent court be appointed "trustee, guardian, receiver or committee of the estate," or to any other fiduciary office; and that, when designated by the comptroller of the state, it may be a depositary of court funds. By section 190 it is provided that "no bond or other security, except as hereinafter provided, shall be required from any such corporation for or in respect to any trust, nor when appointed executor, administrator, guardian, trustee, receiver, committee or depositary"; all investments of money by the company "in either of such characters" shall be at its own risk, unless the investments be of an authorized character. Then follows the sentence on which the respondents hang their claim for a preference:

"If dissolved by the Legislature, or the court, or otherwise, the debts due from the corporation as such executor, administrator, guardian, *trustee*, committee or depositary, shall have the preference. The court or officer making such appointment may  *  *  *   require any corporation which shall have been *so appointed*, to give  *  *  *   security as to the court or officer shall deem proper," etc.

The words "any trust" in the first paragraph of section 190 evidently refer to trusts by court appointment under section 189, and "the debts due from the corporation as such  *  *  *   trustee" necessarily are debts owing on account of similar trusts. The next following paragraph would seem to remove all doubt, if any remained: "The court or officer making such *appointment*," etc. The word "appointment" applies to all of the fiduciary capacities thereinbefore in the section recited, and includes only the judicial trusts and trustees therein provided for.

In Henkel v. Carnegie Trust Co., 213 N. Y. 185, 107 N. E. 346, it was recently held, construing in part these same sections 189 and 190, that the preference of court funds extends only to moneys deposited pursuant to order or decree of our state courts. Referring to the word "depositary," the last word in the first paragraph of section 190, the court (213 N. Y. 192, 107 N. E. 348) said: "The depositaries in view must have been those appointed by the courts of this state." These

·words are equally applicable to the words "any trust," which precede the word "depositary" in the same paragraph.

I conclude, therefore, that inasmuch as the Carnegie Company was not acting as trustee of the several trusts in question by virtue of judicial appointment the trust moneys are not preferred by the statute.

[6] (2) Does equity give a preference? It is not disputed that all of the makers of the aforesaid notes are insolvent. It may also be conceded that, from the time of its receipt of the checks until its failure, the Carnegie Company had and continued at all times to have in its possession cash, or cash and its equivalent in loans and securities, to an amount far in excess of the moneys in question. A considerable portion of its loans were necessarily maturing during this period, and were either wholly or partly paid or were renewed. In liquidation, its preferred debts so far as allowed have been paid in full, and 35 per cent. has already been paid on account of unsecured liabilities, after allowing for all contested preferred claims. Its report of November 10, 1910, showed that its total preferred debts (other than state deposits secured by a special deposit of bonds) were only about $247,000, while its cash and "cash items" aggregated about $900,000. From the fact that the institution was suspect and under the observation of the banking department from a time prior to the occurrence of the events involved in these actions, we may assume that from this time until its failure the condition of the company was not materially changed for the worse. If money to which one person is legally or equitably entitled is wrongfully mingled by another with money of his own, so that the whole forms one indistinguishable mass, two courses are open to him who is wronged: (1) He may assert an equitable lien on the entire fund for the amount of his money; or (2) he may claim that the delinquent is holding for him in constructive trust a portion of the commingled fund proportioned to his contribution thereto. The books contain many illustrations of the pursuit of these several remedies. Importers' & Traders' Nat. Bank v. Peters, 123 N. Y. 272, 25 N. E. 319; Blair v. Hill, 50 App. Div. 33, 63 N. Y. Supp. 670, affirmed 165 N. Y. 672, 59 N. E. 1119; Nat. Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693. And see, per Jessel, M. R., Knatchbull v. Hallet, 13 Ch. D. 696, 709. In some jurisdictions the claimant is given a preference over the general creditors of the wrongdoer upon proof that the latter had the benefit of the misappropriated moneys, even though it is impossible to prove that the fund for distribution among the general creditors is at the time larger than it would have been but for the misappropriation. But by a great preponderance of authority it is held that, if it appears all of the trust moneys have been dissipated by the trustee and none remains to compose part of the fund on hand, obviously the claimant cannot establish a lien or trust for want of any specific res upon which the same may be impressed, and hence he can have no particular equity in or charge upon the assets of the wrongdoer. For this reason he has no preference over general creditors. Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504; Atkinson v. Rochester Ptg. Co., 114 N. Y. 168, 21 N. E. 178; Re Hicks, 170 N. Y. 195, 63 N. E. 276; Cole v. Cole, 54 App. Div. 37, 66 N. Y. Supp. 314. Among many oth-

er cases to the same effect, I select the following: Lowe v. Jones, 192 Mass. 94, 78 N. E. 402, 6 L. R. A. (N S.) 487, 116 Am. St. Rep. 225, 7 Ann. Cas. 551; Empire Surety Co. v. Carroll County, 194 Fed. 593, 114 C. C. A. 435; In re Larkin (D. C.) 202 Fed. 572; Bd. of Fire, etc., Com'rs v. Wilkinson, 119 Mich. 655, 78 N. W. 893, 44 L. R. A. 493. Nor is plaintiff aided by the fact that a portion of its moneys were used by Cummins to pay "directors' loans" owing to the Carnegie Company, for this is too vague an equity to justify any preference. Per Andrews, J., Cavin v. Gleason, supra, 105 N. Y. 263, 11 N. E. 504.

[7] Fourth. It appearing that no stocks were bought with plaintiff's money, and it having failed in its attempt to establish a lien, may it have a money judgment for its debt? I should have deemed this question too elementary for serious discussion, were it not that it is thought otherwise by some of my Associates. I concede that, if there was no trust, this action should fail. But if a trust has been established, as I think it has, then I think it is perfectly clear that plaintiff may have judgment for the amount due. Wherever a trust exists, the right to an accounting follows as a matter of course. There may be a concurrent right of the cestui to resort to a court of law; but, if this exist, he has his election to pursue either remedy, for neither is exclusive. If it be a case of true trust (as distinguished from a quasi trust, such as exists in certain kinds of agencies—1 Story, Eq. Juris. [18th Ed.] §§ 463, 464; Langdell, post, tit. "Actions for Account"), the fact that the matters in question involve but a single transaction or but one sum of money is immaterial, for jurisdiction in cases of trust arises, not out of the nature or intricacy of the accounts involved, but out of the trust relation. A bill by a cestui against his trustee "is never a bill for an account in point of jurisdiction." Langdell, Brief Sur. Eq. Juris. (2d Ed.) 97. If a trust, or even a quasi trust, is decreed, although the bill fails to justify relief by injunction, lien, rescission, or the like, a money judgment for the sum found due is properly awarded. Fowle v. Lawrason, 5 Pet. 495, 8 L. Ed. 204; Clews v. Jamieson, 182 U. S. 461, 479, 480, 21 Sup. Ct. 845, 45 L. Ed. 1183; Lightfoot v. Davis, 198 N. Y. 261, 270, 271, 272, 91 N. E. 582, 29 L. R. A. (N. S.) 119, 139 Am. St. Rep. 817, 19 Ann. Cas. 747; Marvin v. Brooks, 94 N. Y. 71; Van Rensselaer v. Van Rensselaer, 113 N. Y. 207, 213, 214, 21 N. E. 75; Jordan v. Underhill, 91 App. Div. 124, 128, 86 N. Y. Supp. 620. Having regard for the duties assumed by the Carnegie Company in this instance, Haight v. Haight & Freese Co., supra, is singularly apposite.

I conclude, therefore, that plaintiff is entitled to judgment for the principal of its debt and to rank as an ordinary creditor therefor.

The judgment appealed from should be modified accordingly as directed in opinion, and, as modified, affirmed, without costs.

LAUGHLIN and DOWLING, JJ., concur.

SCOTT, J. I agree with the conclusion at which Mr. Justice HOTCHKISS has arrived, that in no aspect of the case is the plaintiff entitled to a preferential lien upon the assets of the Carnegie Trust

Company now in the hands of the superintendent of banks as official liquidator. This conclusion, however, in my opinion, renders it necessary to reverse the present judgment in toto and to remit the plaintiff to an action at law. Among the defenses pleaded by the defendants and insisted upon at the trial was one to the effect that plaintiff had an adequate remedy at law. That plea was disregarded by the trial court, because it was of the opinion that plaintiff was entitled to a preferential lien, which, if established, would have justified an appeal to equity. The right to such a preference being now denied, the jurisdiction for an adjudication in equity has disappeared, and the defense that there is an adequate remedy at law is established. This is true under any theory upon which plaintiff can sustain its claim against the Carnegie Trust Company. The plaintiff's theory, and this is the one accepted by my Brother HOTCHKISS, is that the money of the Van Norden Trust Company, predecessor of this plaintiff, was received by the Carnegie Trust Company upon an undertaking to apply it to a specific purpose, to wit, the purchase of certain stocks, but that it never used the money for that purpose. Assuming for the moment that the money did pass from the Van Norden Trust Company to the Carnegie Trust Company as the money of the first-named company I am unable to see that any technical trust relation resulted. That could result, under the cases upon which plaintiff relies, only if the Carnegie Trust Company accepted the money upon a valid agreement to apply it in a particular way. One is not to be made a trustee except by his own act or consent, and the mere fact that the Van Norden Trust Company sent the money to the Carnegie Trust Company to be used in a particular way did not of itself constitute the Carnegie Trust Company a trustee. Something more was necessary, to wit, the agreement of the Carnegie Trust Company to so apply the money. Of such an agreement I see no evidence. Certainly the Carnegie Trust Company did not formally agree by any corporate act. No officer professed to consent to its name, unless the letter of the vice president be accepted as such an undertaking. That letter, however, was not signed in the name of the company, nor was the company in any way referred to in it. As to the authority of the vice president to bind the company to any such agreement I shall have something to say later in this opinion. For the present it is sufficient to say that, even assuming that the Carnegie Trust Company received the money, I can find no legal evidence that it assumed any obligation to apply it in any particular manner. If this be so, the proper form of action in which to recover it is an action for moneys had and received. Such an action is triable upon the law side of the court before a jury. If the plaintiff had been entitled, as it claims to be, to impress a preferential lien upon the assets of the Carnegie Trust Company, a suit in equity was the appropriate remedy, because relief was sought which could not have been obtained at law by a mere money judgment, and the court, acting on its equity side, having taken jurisdiction for one equitable purpose, would retain jurisdiction for all purposes. But, when the claim upon which alone a resort to equity is justified has been disallowed, the right to recover a money judgment in equity in an action otherwise triable before a jury is lost. Otherwise, an easy method of avoiding a jury trial would be provided, for any plaintiff having a

mere demand for a money judgment could avoid a jury trial by asserting an unfounded claim for equitable relief. It has long been the law that this may not be done. Bradley v. Aldrich, 40 N. Y. 504, 100 Am. Dec. 528.

If, as I think is the legal result of the evidence, the Carnegie Trust Company never received the money of the Van Norden Trust Company, because the checks were diverted and stolen by Cummins while the money thereby represented was still the property of the Van Norden Trust Company (People v. Cummins, 153 App. Div. 93, 138 N. Y. Supp. 517, affirmed 209 N. Y. 283, 103 N. E. 169), then the appropriate form of action would be one for damages for the conversion, which is clearly an action cognizable at law.

If I am right in the conclusion that the judgment appealed from must be reversed in toto, it is unnecessary to discuss at length at the present time the fundamental question whether or not the plaintiff has shown any enforceable claim against the Carnegie Trust Company. As I look at it, the money of the Van Norden Trust Company never became a part of the assets of the Carnegie Trust Company in such a manner as to create a liability by the latter company to the former. It is true that the Carnegie Trust Company collected the checks, but it did so for account of Cummins, and thereby assumed an obligation to him. If this be so, plaintiff cannot recover as for money had and received, and must fall back upon the letter signed by its vice president, Smith, on April 20, 1910, upon the faith of which, as it is said, the Van Norden Trust Company drew and forwarded the checks to the Carnegie Trust Company. This letter does not purport on its face to be the act of the Carnegie Trust Company. It is not signed in the name of that company, and that company is not named in it, except that the name of the company and the roster of its officers is printed on the letter head. The signature is merely, "R. L. Smith, Vice President." This is not equivalent to a signature by the corporation, even though it may be said to appear inferentially that Smith was vice president of the Carnegie Trust Company and intended to sign the letter as such. Buffalo Catholic Inst. v. Bitter, 87 N. Y. 250.

Nor does the letter carry any presumption, upon which the Van Norden Trust Company was entitled to rely, that Smith as vice president was authorized to execute the agreement on the part of the Carnegie Trust Company, for the agreement itself is neither made in the name of the company, nor does it bear its seal. People's Bank v. St. Anthony's R. C. Church, 109 N. Y. 512, 17 N. E. 408. The evidence is very clear that Mr. Smith was never in fact authorized to make the agreement in behalf of the Carnegie Trust Company. If the stocks had actually been bought, it would, I think, be well within the corporate power of the Carnegie Trust Company to hold them as trustee for the Van Norden Trust Company, and an agreement to do so, signed in the name of the company by any general officer, would doubtless be within the apparent scope of his authority. It is not that portion of the agreement, however, which the company is charged with breaching, for it never came into possession of the stock. The breach with which it is charged is that it did not buy the stocks at all, and this part of the agreement was not in my opinion, within the apparent scope of Mr.

Smith's authority.   No doubt the Carnegie Trust Company might have lawfully undertaken a trust which would involve both buying stocks on the market and then holding them in trust; but there is nothing in the case which would justify a presumption of authority in the vice president to so agree, in face of the established want of actual authority.   As was said by this court in a case afterwards affirmed by the Court of Appeals:

"Parties dealing with a business corporation, as distinguished from religious and other corporations, may rely upon the apparent authority of the officers; * * * but in the absence of evidence upon which estoppel may be predicated, as by holding out as authorized or a course of dealing, the question in all cases * * * is whether the contract was authorized, and where it appears that it was not, and there has been no estoppel, that becomes a complete defense."   Gause v. Commonwealth Trust Co., 124 App. Div. 438, 451, 108 N. Y. Supp. 1080, 1089, affirmed 196 N. Y. 134, 89 N. E. 476, 24 L. R. A. (N. S.) 967.

See, also, Davidge v. Guardian Trust Co., 203 N. Y. 331, 96 N. E. 751; Jacobus v. Jamestown Mantel Co., 211 N. Y. 154, 105 N. E. 210.

It is clear that, if plaintiff can recover at all, it must be on the ground of estoppel, for, as has been said, the money sued for never came actually into the hands of the Carnegie Company as the property of the Van Norden Trust Company, having been diverted into Cummins' pockets.   The Carnegie Trust Company never derived the benefit from it, and Smith, its vice president, never had actual authority to agree on behalf of the Carnegie Company to take the money and use it to buy stocks in the open market.

Upon the ground of estoppel it would seem that plaintiff must fall. It nowhere appears that the Carnegie Company had ever engaged in the business of buying stocks for others, or that it had held out its vice president, Smith, as authorized in its behalf to engage to transact that business, which was certainly not a part of the generally understood business of the trust company.

For these reasons, I am of opinion that the judgment must be reversed, and the complaint dismissed, with costs to appellants in all courts.

INGRAHAM, P. J.   I concur with Mr. Justice SCOTT that this judgment should be reversed, and the complaint dismissed, on the ground that there was no enforceable contract made between the Carnegie Trust Company and the plaintiff, and no money of the plaintiff was ever received by the Carnegie Trust Company.   The plaintiff, at the time of the transaction in question, was known as the Van Norden Trust Company; its name having been subsequently changed to the Madison Trust Company.   At all the times in which the transaction upon which this claim is founded took place, one William J. Cummins was a director and a member of the Carnegie Trust Company, and was also a director of the Van Norden Trust Company.   One Van Norden had been the president of the Van Norden Trust Company, but had resigned, and Watkins Crockett had been elected president in his place.   Van Norden had obtained loans from various banking corporations, and deposited as collateral

security therefor stock of the Van Norden Trust Company and two other banks, known as the Twelfth Ward Bank and the Nineteenth Ward Bank, which also seem to have been controlled by Cummins and his associates. These loans had been called, and it seems to have been assumed by Cummins that, if the loans were not paid and the stock of these institutions were sold, it would in some way injure the standing of the Van Norden Trust Company. With all this the Carnegie Trust Company had nothing to do, and so far as appears was not at all interested. One Reichman was president of the Carnegie Trust Company, and also a director in the Van Norden Trust Company. On April 19, 1910, there was a meeting of the directors of the Van Norden Trust Company. There were present at that meeting Watkins Crockett, chairman, Shoemaker, Martin, Jr., McIlvaine, Cummins, Condon, Reichman, Moore, Jr., and Baumann. Cummins made a statement at that meeting that he had requested the plaintiff trust company to make to Mr. Moore, Mr. Condon, and Mr. Reichman unsecured loans, but that Mr. Martin had opposed the making of such loans, and they had now abandoned that request; that they had asked for loans because they had learned that the Van Nordens, father and son, had various loans at various banking institutions, part of the collateral of which loans was stock of the Twelfth Ward Bank and the Nineteenth Ward Bank; that the Van Nordens were unable to pay the loans, which were being called, and the Van Nordens would go into bankruptcy; that their bankruptcy would injuriously affect the Van Norden Trust Company; that Cummins, Condon, Reichman, and Moore desired to purchase from the Van Nordens these stocks of the Twelfth and Nineteenth Ward Banks, and in that way supply the Van Nordens with money with which to pay these loans and keep the Van Nordens out of bankruptcy. They proposed that these loans be secured loans, to be accomplished through the medium of a trustee, and that a paper appointing a trustee be drawn; that to the trustee be paid the proceeds of these loans that were to be made, and that the trustee should, out of the proceeds of the loan, purchase the stocks, which stocks would be collateral to the loan; that they proposed this trustee for the protection of the Van Norden Trust Company. This proposition appears to have been approved and verified by Reichman and other directors. There was then a discussion as to who should be appointed trustee. Two members of the board present declined to act as trustee, and further discussion resulted in the passage of the following resolution:

"That the following application for demand loans at 6 per cent. are hereby approved, subject to the approval of the officers:

| | |
|---|---:|
| Martin J. Condon | $75,000 |
| J. B. Reichman | 60,000 |
| Charles A. Moore, Jr. | 60,000 |
| George D. Crabbs | 60,000" |

Up to this time the Carnegie Trust Company had had nothing to do with the transaction. Crockett, who had been vice president of the Van Norden Trust Company, was on the 19th of April elected president. He testified that on the 21st of April Arthur Moore and Cummins came up to the trust company with a letter and two notes,.

the Reichman and Moore notes, for $60,000 each.  These two notes were mentioned in the resolution to which attention has been called, and the letter which they presented to the president of the trust company was the letter upon which this claim is based.  That letter was addressed to Crockett, as president of the Van Norden Trust Company.  It acknowledged receipt from the Van Norden Trust Company of $195,-000, the proceeds of the following notes: two of $60,000, and one of $75,000; that the amount was to be used by "us" towards the payment of the Carnegie Trust Company stock at $175, Nineteenth Ward Bank at $250, and Twelfth Ward Bank at $11; that:

"We agree to hold in trust for you, or any trustees named by you, the above collateral as paid for by us at the prices mentioned above.  Whatever part of the above amount is not employed in the purchase of the above stock shall be subject to your order at any time.

"Yours truly,                    R. D. Smith, Vice President."

Crockett says that, when this letter and notes were presented, he told Cummins that it was not in accordance with the understanding of the meeting; that Cummins said that it was the understanding between him and Mr. Martin, that this agreement was entered into with him and Mr. Martin, whereupon Crockett directed the cashier to draw these checks.  He put the checks in an envelope and returned it to Mr. Cummins.  The following day a note of Condon's for $75,-000 was presented, and to that he gave a check for that amount. These checks were drawn to the order of the Carnegie Trust Company.

Mr. George C. Cummins, a brother of William J. Cummins, was called as a witness by the defendant. He testified that he was an assistant of W. J. Cummins in his personal affairs and had no connection with the Carnegie Trust Company; that he dictated this letter of Smith to the plaintiff's president; that he dictated it after a conversation with Crockett over the telephone; that Crockett told him there was going to be some notes sent up, and that Mr. Martin and he had talked the matter over, and they wanted a letter written, addressed to him as president of the Van Norden Trust Company, and that in consequence of that conversation he dictated the letter in question; that after he dictated it he took it to Mr. Smith, who signed it, and he returned to his office; that after he dictated the letter, and Smith had signed it, he took the letter and the Moore and Reichman notes, and went to the Van Norden Trust Company to see Crockett; that he was accompanied by Moore, the maker of one of the notes; that he gave this envelope to Crockett, who took the papers from it and shortly after brought back two checks; that he brought the checks back to Cummins' office and delivered the checks to a Mr. Ball.

Smith, who signed this letter, testified that he was vice president of the Carnegie Trust Company; that he signed this letter addressed to Crockett; that Cummins brought him the letter, and he signed it without knowledge of its contents, and did not see the letter again until January 7, 1911; that he could not say whether it was George Cummins or W. J. Cummings who brought him the letter; that he

had never discussed signing the letter with the president of the bank or with any one else; that the matter was never called to the attention of the board of directors or the executive committee; that he never received any communication or letter from the Van Norden Trust Company in any way relating to the purchase of this stock; that he signed the indorsement on the back of these three checks, two for $60,000 and one for $75,000, on the instruction of Reichman, who was then president of the Carnegie Trust Company; that when he indorsed the check Reichman instructed him to indorse these two checks over to Charles Arthur Moore, as these checks represented the proceeds of the notes that should have gone to the credit of Charles Arthur Moore, the proceeds of his individual note, and this was a matter that Mr. Moore, Mr. Condon, Mr. Cummins, and Mr. Reichman had arranged with the uptown banks; that he then indorsed them over to the account of Moore on this instruction; that the president directed him to indorse the $75,000 check to Cummins. The checks were then taken by Cummins and Moore, deposited to their own private account with the Carnegie Trust Company, and they appropriated the proceeds.

Now from this statement it seems to me perfectly plain that the Carnegie Trust Company had nothing to do with this transaction; that it was an individual transaction between Cummins, Moore, and Reichman, and the Van Norden Trust Company; that no agreement was ever made by the Carnegie Trust Company to act as trustee for the Van Norden Trust Company; and that the Carnegie Trust Company never actually received the money represented by these checks. The checks themselves and the money that they represented were simply stolen from the Van Norden Trust Company before they ever reached the Carnegie Trust Company. Of course, the real fact is that Cummins dominated both trust companies, and this was a device of his to steal this money, in which he was successful. He had no power to make any contract on behalf of the Carnegie Trust Company, or to bind it by any agreement to act as trustee or in any other capacity. The officers of both companies seem to have been his willing tools to aid him in stealing this money, and nothing in this transaction justifies a judgment in favor of the Van Norden Trust Company against the Carnegie Trust Company either as for money had and received—for it received no money—or under any agreement or trust.

I think, therefore, that there was no cause of action of any kind proved against the Carnegie Trust Company; that no trust relation of any kind was established; that no liability existed; and I therefore concur in the reversal of this judgment and the dismissal of the complaint.

The findings of fact and conclusions of law should therefore be reversed, and findings prepared in accordance with the views hereinbefore expressed.