(90 Misc. Rep. 490)

### LEBAUDY v. CARNEGIE TRUST CO. et al.

(Supreme Court, Special Term, New York County. May, 1915.)

1. BANKS AND BANKING ⬤⟿80—INSOLVENCY—PREFERENCES—EQUITY.
　　All preferences in cases of insolvent banking institutions should be resisted by the public authorities, and, except when statutory, should be disposed of by the court on the principle that equality is equity.
　　[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 184–196; Dec. Dig. ⬤⟿80.]

2. EQUITY ⬤⟿59—EQUALITY BETWEEN CREDITORS—PREFERENTIAL PAYMENT.
　　The rule that, as between creditors, equality is equity, admits of no exception, founded on the greater supposed sacredness of one debt, or on the fact that it arose out of a violation of duty, or that its loss involves greater apparent hardship in one case than another, unless it further appears that there is some specific recognized equity, founded on some agreement, or that the relation of some debt to assigned property entitles the claimant to preferential payment according to equitable principles.
　　[Ed. Note.—For other cases, see Equity, Cent. Dig. § 180; Dec. Dig. ⬤⟿59.]

3. BANKS AND BANKING ⬤⟿317—DEPOSIT—TRUST—INSOLVENCY—PREFERENCE.
　　Plaintiff, on depositing with the defendant trust company funds collected by his agent in France, drew on the account and was credited with an agreed rate of interest on his balance. He received, instead of a bank book, statements of "account current," and drew on the account by written instruments, which were in effect checks. The only difference between plaintiff's account and that of other depositors was that it was entered in

---

tfie trust ledger and was repeatedly referred to as a trust by defendant's officers. Plaintiff sued to have it adjudged that a trust existed as to certain of his moneys, and for an accounting, and for a decree that all moneys found due him should be paid in preference to general creditors. *Held* that, as the trust company was not acting as trustee by virtue of judicial appointment, plaintiff was not entitled to any preference by statute.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1222; Dec. Dig. ☞317.]

4. BANKS AND BANKING ☞317—INSOLVENCY—ACTION BY DEPOSITOR—TRUST.

While, in an action between plaintiff and an insolvent trust company, where the character of plaintiff's account is at issue, the trust company might be estopped from denying that the account was a trust one, yet in an action which plaintiff sought to be paid in full, and to be preferred over other depositors, such depositors were not estopped by the trust company's characterization of plaintiff's account.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1222; Dec. Dig. ☞317.]

5. BANKS AND BANKING ☞317—INSOLVENCY—CREDITORS OF TRUST COMPANY —RELATION OF DEPOSITOR—DETERMINATION—EQUITY.

In such case other creditors of the trust company were entitled to have the true relationship concerning plaintiff's account established by the course of dealing between the parties, and according to settled legal principles, the inquiry to proceed from the starting point that equality is equity.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1222; Dec. Dig. ☞317.]

6. BANKS AND BANKING ☞317—INSOLVENCY—RIGHTS OF DEPOSITORS—TRUST.

Even if, in such case, the original quasi trust relation to the funds collected in France under a power of attorney delivered by plaintiff to the trust company persisted down to the closing of the trust company, plaintiff would not be entitled to a preference, where it appeared by the uncontradicted evidence that his funds were commingled with the funds of the trust company and their identity lost, and the trust company showed that the account had been entirely dissipated.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1222; Dec. Dig. ☞317.]

7. BANKS AND BANKING ☞317—INSOLVENCY—TRUST FUND—PREFERENCE— PROOF.

In order to obtain a lien upon all the assets of a company and a preference over all other creditors, it is not sufficient merely to trace trust funds into the general funds of the trust company, but it is essential that the trust fund be ascertained, traced, and identified.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1222; Dec. Dig. ☞317.]

Action by Jacques Lebaudy against the Carnegie Trust Company and another for an accounting and a preference. Account stated, and preference denied.

See, also, 162 App. Div. 76, 147 N. Y. Supp. 180.

William K. Olcott, Walter M. Ernst, and Theodore B. Chancellor, all of New York City, for plaintiff.

Frank M. Patterson, John K. Clark, and John B. Loughborough, all of New York City, for defendants.

SHEARN, J. [1] In this action plaintiff seeks to have it adjudged that a trust exists with respect to certain moneys of the plaintiff, and

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

demands judgment for an accounting and a decree that all moneys found due the plaintiff should be paid in preference to the general creditors of the insolvent Carnegie Trust Company, which is in the hands of the superintendent of banks, in liquidation. The trust company was not acting as trustee by virtue of judicial appointment, and therefore, under the authority of Madison Trust Co. v. Carnegie Trust Co., 167 App. Div. 4, 152 N. Y. Supp. 517, the plaintiff is not entitled to any preference by the statute. The contention that plaintiff is entitled to a preference in equity requires consideration.

[2] On and prior to April 20, 1909, plaintiff owned certain property situated in the republic of France, consisting of estates in real property and of personalty and choses in action. On said date, plaintiff delivered to the Carnegie Trust Company a power of attorney, duly executed February 25, 1909, empowering it to receive, take possession of, manage, and dispose of all his property in the republic of France, in such manner and on such terms as might be deemed expedient. With the power of attorney plaintiff delivered to the defendant a letter signed by him, dated April 12, 1909, in which, referring to the power of attorney and the services to be performed thereunder, it was stated:

"For this service the Carnegie Trust Company shall receive a commission of ten per cent. (10%) of the net cash receipts derived from the undertaking, and shall hold the proceeds thereof for my account until otherwise instructed."

The trust company, by letter dated April 20, 1909, acknowledged receipt of the power of attorney and said letter of April 12th, stating:

"Both of the instruments are entirely satisfactory to us, and we accept the trust in accordance with the terms therein expressed."

At the time of the appointment of the trust company as attorney for the plaintiff, it was agreed between the parties that the trust company would send its vice president, James Ross Curran, as its representative, to France, and would endeavor to dispose of all of the property and interests of the plaintiff there. On or about April 23, 1909, the trust company exercised the power of substitution conferred upon it by the power of attorney, and appointed the said James Ross Curran and S. G. Archibald, an American lawyer located in Paris, as substituted attorneys of the plaintiff, to exercise all the powers conferred by the original power of attorney. Thereafter Messrs. Curran and Archibald purported to and did act as substituted attorneys of the plaintiff in connection with his property and affairs in the republic of France, and between May 1, 1909, and February 28, 1910, Mr. Archibald collected certain sums of money, representing rents and profits from the plaintiff's property in France and money on deposit. On April 29, 1909, plaintiff delivered to the trust company 149 coupons of Suez Canal bonds, with instructions that the coupons be collected and the proceeds credited to the plaintiff's account with the trust company. The coupons were forwarded by the trust company to Mr. Curran at Paris, who placed them in the hands of a bank in Paris, which collected the coupons and credited the account of the trust company with the proceeds. The trust company received notice of the credit on May 25, 1909, and thereupon opened an account in its trust ledger with "Jacques Lebaudy," the plaintiff. The account was an ordinary debit

and credit account, and was opened by crediting the plaintiff with the sum of $3,155, representing the proceeds of said coupons. The form of the statement of account, by debit and credit, was approved by the plaintiff, who wrote the trust company that his long experience in banking had satisfied him that this form of statement was the only practical one. From the time the account was opened, all collections made by the trust company for the plaintiff were credited to the plaintiff in this account, and all withdrawals by the plaintiff and expenses incurred by the trust company in executing the power of attorney were charged against the plaintiff in this account. It was agreed between the parties that interest should be paid on the account of the plaintiff with the trust company at the Bank of England rate, in whosesoever favor the balance might be.

The trust company, not being a member of the clearing house, maintained a bank account with the National City Bank. This was an ordinary bank account, maintained by the trust company in the ordinary course of its business, and in this account the trust company deposited from 80 to 90 per cent. of the general deposits of cash, checks, and drafts received by it from its depositors, both ordinary bank depositors and those who deposited funds with it as trustee or in a quasi trust capacity. In this account the trust company also deposited cash, checks, and drafts paid to it in the ordinary course of business. Against the credits created by such deposits, made by the trust company with the National City Bank, funds were drawn by the trust company in the ordinary course of its business, for cash, and for the payment of funds due from the trust company on account of its own general transactions and on account of checks drawn upon it by depositors which were accepted by it, payable out of its said National City Bank account. There was no fixed level at which the balance to the credit of the trust company in the National City Bank was required to be maintained, and there is no evidence that there was at all times maintained a balance, except such as was required from hour to hour during banking hours to meet drafts which had been made on the account and which were being presented constantly during the day to the National City Bank for payment out of the balance. During the period which elapsed between the time when the proceeds of the collections made by the trust company under the power of attorney were deposited to the credit of its account with the National City Bank and the time when the trust company was closed on January 7, 1911, there were a number of days when, at the close of business, there was to the credit of the account less than $150,000; at the close of business on March 25, 1910, there was a credit balance of only $79,448; and on January 7, 1911, when the trust company ceased doing business, there was a credit balance to said account of $462,015. The only permanent record maintained by the National City Bank of the balance to the credit of the account was the record of the balance standing to the credit of the account at the close of business each day. There were debited against the account every banking day large numbers of drafts upon it in the form of checks, acceptances, and certifications, and there were credited to it every

banking day large numbers of deposits, made sometimes in 12 or 15 batches during the day. Moneys deposited with the trust company, as trustee, and moneys deposited with it by individuals known to be acting in trust capacities, were redeposited by it in the National City Bank account, and mingled with the defendant's ordinary deposits in the same manner in which the proceeds of the collections made by the defendant under the power of attorney were mingled. On March 25, 1910, there was over $400,000 of such trust funds represented in this account, which varied from said low level of $79,448 to over $1,000,000, during the period when plaintiff's funds were being deposited in said account. At one time during said period there was nearly $700,000, which was either trust funds or clearly quasi trust funds, the proceeds of which had entered into this deposit account, exclusive of the deposits of defendant's collections for the plaintiff. The manner in which plaintiff drew upon his account with defendant is very significant. As above stated, the first credit was $3,155 on or about May 28, 1909. On June 8, 1909, the plaintiff addressed the defendant as follows:

"Jacques Lebaudy.                                Post Office Box 1655.
                                          "New York City, 8 June, 1909.
    "Carnegie Trust Company, 115 Broadway, City—Dear Sirs: Will you kindly pay to Mr. Charles Vattier or his order a sum of 5,000 international gold francs, which kindly place to the debit of my account, and oblige,
        "Very truly yours,                [Signed]   Jacques Lebaudy."

On June 9, 1909, defendant paid to the payee therein mentioned, Charles Vattier, the sum of $1,000, and, pursuant to said draft or order, specifically directing such entry, debited plaintiff's account with that sum. On or about June 15, 1909, Mr. Archibald paid to Mr. Curran the sum of 80,000 francs in cash out of moneys collected by him under the power of attorney, and on the same day Mr. Curran deposited that sum to the credit of the defendant in a Paris bank and notified the defendant by cable of the credit. On the following day the defendant sold to the Hanover National Bank a cable transfer of 80,000 francs in Paris and received therefor a cashier's check of the Hanover National Bank for $15,493.95, payable to the order of the defendant, which check was deposited by the defendant to the credit of its account in the National City Bank on June 17, 1909, and on the same day the account of the plaintiff with the defendant was credited with said sum, less $53.66, commission for sale of cable exchange. Quite similarly, on August 24, 1909, plaintiff's account was credited with $5,783.13, the proceeds of a collection of 30,000 francs made by Mr. Archibald and paid to Mr. Curran.

On September 9, 1909, the defendant, at the request of the plaintiff, paid the plaintiff the sum of $2,000, the plaintiff having delivered to the defendant an instrument of which the following is a copy:

"Jacques Lebaudy.                    New York City, 7 September, 1909.
                              "Receipt.
    "Received from Carnegie Trust Company $2,000 of the United States of America for which amount I credit their account.
                              "[Signed]   Jacques Lebaudy."

The payment was charged against plaintiff in said account. On September 30, 1909, the defendant, at the request of the plaintiff, paid to the plaintiff the sum of 10,000 international gold francs, and charged same against the plaintiff in said account, the plaintiff having delivered to the defendant an instrument of which the following is a copy: ·

"Jacques Lebaudy.                     New York City, 30 September, 1909.

"Received this day from the Carnegie Trust Company, the sum of ten thousand (10,000) international gold francs, with which sum I credit their account.
                                        "[Signed]   Jacques Lebaudy."

On October 1, 1909, the defendant, at the request of the plaintiff, paid to the plaintiff 20,000 international gold francs, and charged same against the plaintiff in said account, having received from the plaintiff an instrument of which the following is a copy:

"Jacques Lebaudy.                       New York City, 1 October, 1909.

"Received this day from the Carnegie Trust Company the sum of twenty thousand (20,000) international gold francs, with which sum I credit their account.                                   [Signed]   Jacques Lebaudy."

On December 14, 1910, plaintiff delivered to the defendant an instrument in writing signed by the plaintiff of which the following is a copy:

"Jacques Lebaudy.                     New York City, ·December 14, 1910.

"Carnegie Trust Company—Dear Sirs: I have the honor to request you to pay to the order of Mr. Paul E. De Fere, at the Standard Trust Company of New York, the sum of 10,000 (ten thousand) dollars of the United States of America, for which amount you will kindly debit my account with you.
     "Yours truly,                      [Signed]   Jacques Lebaudy."

On said day the payee mentioned therein indorsed the instrument on the back as follows:

"For deposit. Pay to the order of the Standard Trust Company of New York.                               [Signed]   Paul E. De Fere."

On December 14, 1910, the defendant delivered to the Standard Trust Company its check in writing, drawn upon itself, dated on that day, payable to the order of the Standard Trust Company, for the sum of $10,000, and on December 17, 1910, the amount of the check was paid by the defendant to the Chase National Bank, to which it had been indorsed and delivered, and the amount thereof was charged against the plaintiff in said account. In the meantime, on or about May 29, 1909, in Paris, Mr. Curran, acting in the name and as mandatory of the plaintiff by virtue of the power of attorney and the substitution thereof, entered into an agreement with Isidore Lambert, of Paris, whereby Curran agreed to sell and convey and Lambert agreed to purchase 17 parcels of real property in France belonging to the plaintiff. Up to said date the plaintiff was the owner of the fee of 9 of the properties, which were known as the free properties, and was the owner in fee of the remaining properties, known as the substituted properties, subject to be divested by the death of the plaintiff, leaving him surviving lawful issue, in which case the issue would take the properties free of any estates or incumbrances created by the plaintiff.

The purchase price of the free properties was the sum of 1,000,000 francs, and the purchase price of the substituted properties was 500,-000 francs and a certain promissory note for 1,000,000 francs payable upon certain conditions to the plaintiff's heirs after his death.   On August 9, 1909, the properties sold were duly conveyed, and the sum of 1,500,000 francs was paid to Mr. Archibald, as sequestrator, until any possible charges or incumbrances against the property should be removed.   On September 14, 1909, Mr. Archibald, as sequestrator, deposited the sum of 1,500,000 francs to the credit of the defendant in a Paris bank and notified the defendant by cable of the credit.   On September 15, 1909, the defendant sold cable exchange in Paris to the amount of 1,250,000 francs to the Guaranty Trust Company, and received in payment a check of the Guaranty Trust Company for $241,-621.38, drawn upon the First National Bank, which check was deposited on the same day by the defendant to the credit of its account in the National City Bank.   On the same day the defendant sold cable exchange in Paris to the amount of 250,000 francs to the National City Bank, and received in payment a cashier's check of the National City Bank for $48,337.32, which check was deposited by the defendant on that day to the credit of its account in the National City Bank.   At the same time the defendant credited to the account of the plaintiff the sum of $289,246.98, crediting the foreign department with $711.72, representing the difference in exchange.

On August 18, 1909, the plaintiff wrote the defendant, complaining that he had not received any reports about what the defendant was doing in connection with his affairs, and directing the defendant not to use the power of attorney without his written instructions.   Ten days later plaintiff wrote again, charging the defendant with negligence, and on October 11, 1909, plaintiff notified the defendant in writing that, having become satisfied that the defendant had misused the confidence that he placed in it; he had revoked the power of attorney.   The formal revocation sent the defendant was dated October 14, 1909.   As noted above, the transactions in France had already been consummated.   Further collections, however, were received by the defendant, for, on November 29, 1909, there was deposited by Mr. Archibald to the credit of the defendant in a Paris bank the sum of 324,000 francs, representing various net collections made by Mr. Archibald as substituted attorney for the plaintiff, and the defendant was notified by cable of the credit.   On December 1, 1909, the defendant sold cable exchange in Paris to the amount of 300,000 francs to the National City Bank and received therefor a cashier's check of the National City Bank for $58,075.06, which check was deposited on said date to the credit of the account of the defendant in the National City Bank, and on the following day the account of the plaintiff with the defendant was credited with said sum less $243.73, representing the cable exchange.

On the 11th and 23d days of December, 1909, the account of the plaintiff was credited with the sums of $4,626.50 and $200, respectively, representing the balance of the deposit of 324,000 francs in said Paris bank, after the sale of the cable exchange of 300,000 francs. This credit so created was never made the subject of a specific draft by

defendant, but was exhausted by drafts on and payments out of the account made by the defendant in the ordinary course of its business. The final credit was on February 28, 1910, when Mr. Archibald deposited to the credit of the defendant in a Paris bank 5,574.80 francs out of sums collected by him as substituted attorney for the plaintiff, and notified the defendant by cable of the deposit, whereupon, on February 28, 1910, there was credited to the account of the plaintiff with the defendant the sum of $1,072.66, representing said deposit. This credit was never made the subject of a specific draft by the defendant, but was exhausted by drafts on and payments out of said account by the defendant in the ordinary course of its business.

On January 7, 1911, the trust company, being hopelessly insolvent, was taken over by the superintendent of banks. On that day it had cash on hand in its vaults amounting to $50,260.05, and to its credit in the National City Bank the sum of $462,015. The total amount of claims of general creditors of the trust company, presented to the superintendent of banks and allowed by him, is the sum of $6,239,005. There is no evidence that any part of the checks aggregating $363,-527.71, received by the defendant in exchange for the sale of drafts aggregating 1,880,000 francs and deposited in the National City Bank to the credit of the account of the defendant, remained in said account until the 7th day of January, 1911, or, in any form, came into the hands of the superintendent of banks, and there is no evidence that any part of the proceeds of the sale of the plaintiff's property in France, or of the sums collected by Mr. Archibald, was a part of the assets of the defendant, in their original or in a converted form, on the 7th day of January, 1911, nor that they came into the possession of the superintendent of banks.

I regret that this statement of the facts is so lengthy, but it is unavoidable, for it is the facts that disclose the course of dealing between the parties, and the course of dealing determines the conclusion. Once the plaintiff's funds, collected by his agent in France, were deposited in the defendant bank or trust company, and a debit and credit account was opened upon which plaintiff drew repeatedly and at will, and upon the balances of which account plaintiff was credited with an agreed rate of interest, what substantial difference was there between the plaintiff's relations with the trust company and that of the 5,000 other depositors in the institution? His funds were not set apart in a special depository or supposed to be. His funds were not invested in securities, nor were they supposed to be; on the contrary, it was clearly contemplated that the trust company should use these funds as it used all ordinary deposits in its business, and for the right so to do it paid the plaintiff a stipulated rate of interest. Plaintiff did not have a bank book, but instead he received statements of "account current" between himself and the trust company; these debit and credit statements differing only from a bank book in that they had no leather cover. The plaintiff had no check book with numbered stubs, but he drew on the account by means of written instruments that were virtually checks. There can be no question that, if he had used a Carnegie Trust Company check book and had drawn

checks on his account, they would have been paid so long as the account was not overdrawn. The only difference between plaintiff's account and that of the other ordinary depositors was that plaintiff's account was entered in the trust ledger and was repeatedly referred to by the defendant's officers as a "trust."

[3-5] The actual and legal relationship between the parties must not be determined by the characterization of the account by one of the parties, or by both of them, for that matter. It might well be that, in a contest between the plaintiff and the trust company, where the character of the account was in issue, the trust company would be estopped from denying that this was a trust account. But it must be remembered that this is in reality a contest between this plaintiff and 5,000 depositors of an insolvent institution, in which one depositor is seeking to be paid in full and preferred over all of the other depositors. The vital distinction is clear. Lightfoot v. Davis, 198 N. Y. 273, 91 N. E. 582, 29 L. R. A. (N. S.) 119, 139 Am. St. Rep. 817, 19 Ann. Cas. 747. These other depositors are not estopped by the characterization of this account by the trust company. They are entitled to have the true relationship established by the proved course of dealing between the parties and according to settled legal principles interpreting and giving effect to such a course of dealing. In such a case the inquiry should proceed from the starting point of that principle of equity which declares that equality is equity. As Chief Judge Andrews said in a leading case:

"It is clear, we think, that upon an accounting in bankruptcy or insolvency, a trust creditor is not entitled to a preference over general creditors of the insolvent, merely on the ground of the nature of his claim; that is, that he is a trust creditor, as distinguished from a general creditor. We know of no authority for such a contention. The equitable doctrine that as between creditors equality is equity admits, so far as we know, of no exception founded on the greater supposed sacredness of one debt, or that it arose out of a violation of duty, or that its loss involves greater apparent hardship in one case than another, unless it appears in addition that there is some specific recognized equity founded on some agreement, or the relation of the debt to the assigned property, which entitles the claimant, according to equitable principles, to preferential payment." Matter of Cavin v. Gleason, 105 N. Y. 256, 262, 11 N. E. 504, 506.

It may be conceded that the defendant, in collecting plaintiff's rents and funds in France and converting his real estate, occupied a quasi trust relation. Acting as his attorney in France, the relation created was that of principal and agent. It does not follow, however, that, because this quasi trust relationship was created under the power of attorney, the funds received by the trust company were trust funds after they had been transmitted to the United States and credited to the plaintiff upon a drawing account, with interest on balances. In this connection, the letter of the plaintiff accompanying the power of attorney is significant. In this letter, which postdates the power of attorney, and was written after conferences between plaintiff's counsel and the officers of the trust company, the following language is used:

"The Carnegie Trust Company will send its representative to France, and endeavor as soon as possible to dispose of all my property and interests there. For this service the Carnegie Trust Company shall receive a commission of ten

per cent. (10 per cent.) of the net cash receipts derived from the understaking, and shall hold the proceeds thereof *for my account* until otherwise instructed."

The crux of the situation is the relationship of the parties to the funds when so received after such deduction of 10 per cent. and credited to the plaintiff in an open, drawing account. If the direction had been "remit the proceeds, as received, to me," a trust in the funds would have persisted; but the fact is that the trust company was not to *remit* the proceeds, but was to "hold the proceeds thereof *for my account*." When a bank is given money to hold "for my account," it does not become a trustee. It becomes merely a debtor, and the person delivering such funds to it becomes a general creditor. In cases where checks or drafts are deposited with the bank for collection, it has been uniformly held that, where the arrangement is for collection and remittance, the funds constitute a quasi trust until remitted; but where they are to be collected and held for the account of the customer they constitute a trust fund until collected, whereupon they immediately become a general debt, and the relation of debtor and creditor thereafter continues. See *National Butchers' & Drovers' Bank v. Hubbell*, 117 N. Y. 384, 22 N. E. 1031, 7 L. R. A. 852, 15 Am. St. Rep. 515; *People v. City Bank of Rochester, Matter of Utica City National Bank*, 93 N. Y. 582, 584; *Matter of West of England Bank*, L. R. (11 Ch. Div.) 772; *First National Bank of Circleville v. Bank of Monroe* (C. C.) 33 Fed. 408, 411; *Lippitt v. Thames Loan & Trust Co.* (1914) 88 Conn. 185, 90 Atl. 369, 375; *Goshorn v. Murray*, 210 Fed. (3 C. C. App. 1914) 880, 127 C. C. A. 464; *American National Bank v. Pedley*, 146 Ky. 194, 142 S. W. 239, 38 L. R. A. (N. S.) 146; *Commercial Bank v. Armstrong*, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363. The relation between the parties when these funds were deposited to the credit of the plaintiff in this open drawing account was that of debtor and creditor, and the subsequent dealings with the account conclusively show that the plaintiff was merely a general creditor of the trust company and is therefore entitled to no preference over the several thousand other depositors similarly situated.

[6, 7] But even if it were held that the original quasi trust relation to the funds collected in France under the power of attorney persisted down to the closing of the trust company, plaintiff would not be entitled to a preference upon the facts proved. The evidence shows without contradiction that plaintiff's funds were commingled with the general funds of the trust company and their identity wholly lost in the account kept in the National City Bank, where from 80 to 90 per cent. of all of its funds, trust funds, and miscellaneous accounts and deposits of every sort and description were deposited. This was the trust company's one active bank account. On this account, as has been shown, were drawn the trust company's checks for currency when it needed cash to replenish its own vaults for payments to be made to its own creditors and for funds needed by it for general purposes, while checks drawn on it by its own depositors were accepted by it and paid out of this account. The balance was a varying balance, maintained utterly without regard to any trust funds that might have entered into the account, and the balance varied from over $1,000,000, as on June

6, 1910, to the low overnight balance on the night of March 26, 1910, of $79,448.

The learned counsel for the plaintiff insists ·that having traced the plaintiff's funds into the trust company, and it appearing that the trustee has commingled the funds with its own, the entire property or funds of the trustee are subject to an equitable lien for the amount due the cestui que trust. Such a rule may be applied in some cases, where, for example, an individual, acting as agent or trustee, receives funds and commingles them with his own in a readily traceable deposit in a comparatively inactive account. It is a wholesome rule as between one defrauded and defaulting trustee. I doubt,. however, that it will ever be applied in a contest for preferences between creditors of insolvent trust companies and financial institutions acting as trustees, for it has come to be recognized that dealings with such institutions are based upon their general credit, and not upon the personal trust which one individual reposes in another selected by him as trustee. Moreover, the dealings with respect to the accounts of banking institutions are so complicated, so involved, and so practically impossible to be satisfactorily analyzed for the benefit of one claimant against thousands of others, that there is a distinctly observable tendency in the courts to demand greater accuracy and more complete proof in the tracing of funds, with the result that constantly fewer claims of preference are sustained. It is not sufficient merely to trace trust funds into the general and commingled funds of a trust company, in order to obtain a lien upon all of the assets and a preference over all other creditors. The general rule is, as it was stated in Matter of Cavin v. Gleason, 105 N. Y. 262, 263, 11 N. E. 504, 506, supra:

"That in order to follow trust funds and subject them to the operation of the trust, they must be identified. A court of equity, in pursuing the inquiry and in administering relief, is less hampered by technical difficulties than a court of law, and it may be sufficient, to entitle a party to equitable preference in the distribution of a fund in insolvency, that it appears that the fund or property of the insolvent remaining for distribution, includes the proceeds of the trust estate, although it may be impossible to point out the precise thing in which the trust fund has been invested, or the precise time when the conversion took place. The authorities require at least this degree of distinctness in the proof, before preference can be awarded."

Similarly, in Matter of Hicks, 170 N. Y. 195, 199, 63 N. E. 276, 277, Chief Judge Cullen, after quoting with approval the rule in Cavin v. Gleason, supra, said:

"I know of no case bearing on this subject that does not prescribe the limitation that the trust fund must be 'ascertained, traced and identified.'"

Not only is there no such proof in this case, but the evidence clearly shows that the plaintiff's funds were dissipated. They were not only commingled with the general funds of the trust company in its active bank account in the National City Bank, but this account was drawn upon at will, hour by hour, during a period of several months, the account being drawn down as low, on one of the daily balances, as $79,448, although there were in this account at times, in addition to ordinary deposits, $700,000 of trust funds, not including plaintiff's funds. In this situation, even assuming that this was a trust fund,

and that the burden is on the defendant to show that the fund has been dissipated, the plaintiff is absolutely concluded by the recent decision of the Appellate Division of this court in Madison Trust Co. v. Carnegie Trust Co., 167 App. Div. 4, 152 N. Y. Supp. 517, in which Mr. Justice Hotchkiss, writing a carefully considered opinion for the court on this question of preferences, said:

"By a great preponderance of authority it is held that, if it appears all of the trust moneys have been dissipated by the trustee and none remains to compose part of the fund on hand, obviously the claimant cannot establish a lien or trust for want of any specific res upon which the same may be impressed, and hence he can have no particular equity in or charge upon the assets of the wrongdoer. For this reason he has no preference over general creditors."

Nevertheless, it is still urged that, assuming that the trust relation has been established, the plaintiff is entitled to a preference to the extent of $79,448, which was the lowest level to which the National City Bank account fell on any daily balance during the period of the alleged trust. This rests upon the presumption that the withdrawals of the trustee were made from other than trust funds, and that therefore the balance must represent the plaintiff's funds, and also upon the burden being cast upon the defendant to show that the entire fund was dissipated. Plaintiff fails upon either of these theories. There were $700,000 of other trust or quasi trust funds in this National City Bank account. How can it be presumed that the withdrawals by the trustee were withdrawals of the funds of other cestuis que trustent, instead of the plaintiff's? Of course, there can be no such presumption. In fact, there is a definite rule to the contrary, laid down by Judge Sanborn in Empire State Surety Co. v. Carroll County, 194 Fed. 593, 605, 114 C. C. A. 435, 447:

"Where a trustee has mingled in a common fund the moneys of many separate cestuis que trustent and then made payments out of this common fund, the legal presumption is that the moneys were paid out in the order in which they were paid in, and the cestuis que trustent are equitably entitled to any allowable preference in the inverse order of the times of their respective payments into the fund."

Furthermore, the defendant sustained the burden of showing that the fund had been entirely dissipated. The testimony of the assistant auditor of the National City Bank showed that there averaged from 8 to 14 or 15 credits on the account each day, and from 5 to 10 debits. On such a day as August 18, 1910, when the balance in the morning was $128,000, there were 13 different credits. This indicates that the trust company was keeping close track of its balance at the National City Bank and making a new deposit at very frequent intervals to prevent the account from being overdrawn. The debits on that day which came through the Clearing House—the first 2 items on the list—aggregated $42,000, and taken in connection with those sums the certified check for $164,000 and the check for currency of $50,000, showed that over $250,000 was drawn on the account apparently early in the day when the indications are that the account was reduced practically to a nullity. The same is true of other days, as, for example, March 26 and August 17, 1910. Taking into consideration the method of dealing with this account, the court should not, for the

purpose of giving one creditor a preference over thousands of others, indulge in a presumption that the balance at the close of business on any day represents the low level reached by the account, particularly when the evidence is persuasive rather that the account was drawn down to nothing, if not overdrawn, on more than one occasion. In this connection, see Schuyler v. Littlefield, 232 U. S. 707, 713, 34 Sup. Ct. 466, 58 L. Ed. 806.

Upon all of these grounds, therefore, the plaintiff must fail in his attempt to obtain a preference. His case is a hard one, but it is no harder than that of thousands of other depositors of this wrecked institution. It is not to be wondered that the plaintiff sought a preference, however, in view of the fact that preferential claims to the amount of several hundred thousand dollars have been allowed and paid out to a small group of creditors without any contest in court. In my opinion, all preferences in the cases of insolvent banking institutions should be resisted by the public authorities, except where they are statutory, and should, when in the courts, be disposed of wherever possible upon the principle that equality is equity.

It only remains to state the account between the parties and fix the amount due the plaintiff as a general creditor, which may be done in this action under the authority of the Madison Trust Co. Case, supra. The claim that the defendant was negligent in the execution of its duties under the power of attorney, and therefore should forfeit its commission, is not supported by the evidence. The defendant should be charged with the sum of $396,994.74. It should be allowed 10 per cent. commission upon $378,388.74, the total sum collected, plus $1,032.85, which it improperly credited to foreign exchange. Defendant should be credited with $19,320.68. The amount due the plaintiff from the defendant, with interest thereon to January 7, 1911, is therefore $339,835.19, for which sum plaintiff is entitled to judgment against the defendant Carnegie Trust Company. As plaintiff has prevailed upon the accounting, but has failed upon the main issue with respect to a preference, no costs will be awarded.

Ordered accordingly.